2003 ME 23

## OFFICE OF THE PUBLIC ADVOCATE

v.

## PUBLIC UTILITIES COMMISSION

and

## VERIZON NEW ENGLAND, INC.

Supreme Judicial Court of Maine.

Argued: April 2, 2002.
Decided: Feb. 28, 2003.

Gerald F. Petruccelli, (orally), Petruccelli & Martin, LLP, Portland, Wayne R. Jortner, William C. Black, Office of Public Advocate, Augusta, for appellant.

Peter G. Ballou, (orally), Public Utilities Commission, Augusta, Catherine R. Connors, (orally), William D. Hewitt, Pierce Atwood, Portland, Donald W. Boecke, Verizon New England, Inc., Boston, MA, for appellees.

Robert S. Frank, Harvey & Frank, Portland, (for AARP), for amicus curiae.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, CALKINS, and LEVY, JJ.

CLIFFORD, J.

■ [¶ 1] The Office of the Public Advocate[1] appeals from orders of the Public Utilities Commission relating to the establishment of an "alternative form of regulation" (AFOR), pursuant to 35–A M.R.S.A. §§ 9101–9105 (Pamph.2002), for Verizon New England, Inc., and allowing Verizon to increase its basic service rates. The Public Advocate argues that the orders should be vacated because the Commission failed to comply with statutory requirements governing the regulation of telephone utilities, particularly section 9103(1) requiring that the Commission ensure that the rates for local telephone services under an AFOR are no more than rates would be if they were governed by a traditional rate-of-return method of regulation. The Public Advocate also contends that the Commission exceeded its discretion by allowing Verizon to recover much of the revenue it lost through statutorily mandated reductions in access fees charged to intrastate long distance carriers. We conclude that the Commission acted within its discretion in allowing Verizon to increase its basic service rates,[2] but because we agree, in part, with the Public Advocate that the Commission failed to fully comply with section 9103(1), we vacate and remand to the Commission for further proceedings.

## I. BACKGROUND

[¶ 2] Traditionally, service rates for regulated utilities in Maine have been set

---

1. The American Association of Retired Persons (AARP) filed an amicus curiae brief in support of the Public Advocate. *See* M.R.App. P. 9(e).

2. Generally, a utility subject to an AFOR is precluded from returning to the Commission for relief if its costs are high or profits low. In *New England Telephone & Telegraph Co. v. Public Utilities Commission*, 1997 ME 222, ¶ 7, 705 A.2d 706, 708–09, NYNEX appealed from a Commission order amending its rules to implement the Access Parity Statute, 35–A M.R.S.A. § 7101–B (Pamph.2002), and mandating that Verizon reduce its intrastate access charges by twenty percent, without offsetting charges to make the order revenue

neutral. We recognized the broad authority of the Commission, and concluded that the 1995 AFOR reserved to the Commission the power to issue such an order. Title 35–A M.R.S.A. § 7101(2) (Pamph.2002) provides that the Commission has "all implied and inherent powers under the Title which are necessary and proper to execute faithfully its express powers and functions." In order to comply with section 7101–B, the Commission has the authority to order a reduction in access fees charged by NYNEX. It likewise has the authority to allow Verizon to offset some of its losses resulting from the reduced access fees. *New England Tel. & Tel. Co.*, 1997 ME 222, ¶ 7, 705 A.2d at 708–09.

through the "rate-of-return" (ROR) method. Title 35–A M.R.S.A. §§ 301–312 (1988 & Supp.2002) governs the ROR system of regulation. In a rate-of-return procedure, the Commission determines the utility's revenue requirements, which comprise the sum of the utility's non-capital related expenses and income that will allow the utility to attract both debt and equity investors (the latter referred to as the "cost of capital"). The Commission then establishes rates for all of the utility's various services at levels that will enable the utility to meet its revenue requirements. When using this system, the Commission is empowered to regularly conduct revenue requirement inquiries, *see* 35–A M.R.S.A. § 307, and frequently did so on an annual basis.

[¶ 3] In recent years, critics have contended that guaranteeing to the utility all of its expenses provides little incentive for the utility to increase efficiency and reduce costs, resulting in higher rates.

> Between rate cases, a utility has an incentive to reduce its costs below those reflected in the "revenue requirement" that the Commission has established as the basis for rates, or to increase sales beyond those projected. Nevertheless, the incentives under ROR regulation are weak because, instead of increasing efficiency or sales, a utility may file a rate case as frequently as once a year. Conversely, if a utility actually achieves greater efficiency or increased sales under ROR regulation, it runs the risk that it will "overearn" and that the commission will initiate a proceeding to reduce rates.

*Re New England Tel. & Tel. Co.*, Investigation into Regulatory Alternatives, No. 94–123, Order at 3 (Me. P.U.C May 15, 1995) (hereinafter *1995 AFOR Order*).

[¶ 4] In response to concerns about inadequate incentives resulting from a ROR system of regulation, over the past decade more than thirty-five states have replaced ROR systems of regulation for their largest telephone utilities with some form of "incentive regulation." The main purpose of these alternative, incentive based, forms of regulation is to encourage efficient operations, lower costs, and ultimately lower prices relative to regulation under a ROR system.

[¶ 5] An important feature of incentive regulation is the "stay-out" period. During the period of a stay-out, which in Maine lasts for at least five years but no more than ten years, *see* 35–A M.R.S.A. § 9103(1), the utility's rates are set according to a formula that is divorced from the utility's actual costs. During the stay-out period, the utility cannot return to the Commission if its costs are too high and profits too low, except in extraordinary circumstances. Likewise, the Commission must refrain from initiating a rate case during this period, even if it believes the utility is realizing large profits. The stay-out provides a powerful incentive for the utility to operate efficiently because it will benefit from greater profits. Hence, the alternative form of regulation is designed to affect rate prices, rather than to directly regulate costs and earnings.

[¶ 6] In 1993, the Legislature enacted 35–A M.R.S.A. §§ 9101–9105. The legislation allowed, but did not require, the Commission to adopt an incentive based alternative form of regulation to regulate telecommunications utilities. Section 9103 requires several conditions to be met before any AFOR is adopted:

> *Unless the commission specifically finds that the following objectives are not in the best interests of ratepayers, the commission shall ensure that any alternative form of regulation it adopts under section 9102 is consistent with the following objectives.*
>
> 1. *Alternative regulation; period. For the period of the alternative form*

*of regulation,* which may not be less than 5 years nor exceed 10 years without affirmative reauthorization by the commission, *ratepayers* as a whole, and residential and small business ratepayers in particular, *may not be required to pay more for local telephone services as a result of the implementation of an alternative form of regulation than they would under traditional rate-base or rate-of-return regulation.*

2. Costs. The costs of regulation of telephone utilities must be less under the alternative form of regulation than under rate-base or rate-of-return regulation.

3. Mandates. The alternative form of regulation preserves the ability of the commission to ensure that all legislative and commission mandates directed to the telephone utility are properly executed.

4. Safeguards. The alternative form of regulation must provide adequate safeguards to ensure that risks associated with the development, deployment and offering of telecommunications and related services offered by the telephone utility, other than local telephone services, are not borne by the local telephone service subscribers of the telephone utility and that the utility continues to offer a flat-rate, voice-only local service option.

5. Reasonable charges. The alternative form of regulation must ensure that customers pay only reasonable charges for local telephone services.

6. Reasonable return. The alternative form of regulation must ensure that the telephone utility has, over the period of the alternative form of regulation, a reasonable opportunity to earn a fair return on the investment necessary to provide local telephone services.

7. Encourage telecommunications services. The alternative form of regulation must encourage the development, deployment and offering of new telecommunications and related services in the State.

8. Nondiscriminatory charges. The alternative form of regulation must ensure that another telephone utility pays the telephone utility providing local telephone service reasonable and nondiscriminatory charges for any service used by the other telephone utility to provide its competing service.

9. General safeguards. The alternative form of regulation must include consumer and competitive safeguards.

35–A M.R.S.A. § 9103 (emphasis added).[3]

[¶ 7] In 1995, the Commission adopted an AFOR for NYNEX[4] that was scheduled to last "for the next 5 years, with a possible extension of as much as another 5 years if ordered by the Commission." *1995 AFOR Order* at 8. This AFOR divided services into two basic pricing categories: core services and non-core services.[5] *Id.*

---

3. Title 35–A M.R.S.A. § 7303(2) (1988) also requires that rates established by the Commission for local telephone service be "as low ... as possible."

4. NYNEX was Verizon's predecessor-in-interest. NYNEX merged with BellAtlantic in 1997, and NYNEX's operations in Maine were transferred to a subsidiary, BellAtlantic Maine. BellAtlantic, including its subsidiaries, merged with GTE Corporation in 2000, with the resulting entity being Verizon.

5. A "core" service is one that is integrated with a basic service or has no competitive alternatives or substitutes. *1995 AFOR Order* at 1. Rates for non-core services are not regulated, but rates for core services are subject to pricing regulation. *Id.*

at 59. Core services included nondiscretionary services such as basic exchange service and toll services, where as non-core services included primarily new, competitive broadband services. *Id.* The Commission also developed criteria to use when categorizing later-developed services as core or non-core. *Id.*

[¶ 8] NYNEX was given flexibility to set rates for individual core services but, collectively, the rates had to be set so that the total revenue from the aggregate of all core services would not exceed a revenue cap set by the Commission. The initial revenue caps were set by the Commission following a traditional revenue requirement inquiry. The results were announced in an order released contemporaneously with the *1995 AFOR Order. See Re New England Tel. & Tel. Co.,* Investigation into the Level of NYNEX's Revenues, No. 94–254 (Me.P.U.C. May 15, 1995) (hereinafter *1995 Revenue Order* ).

[¶ 9] The Price Regulation Index (PRI) governs the overall pricing of core services. *1995 AFOR Order* at 38. The PRI is a percentage adjustment calculated with a formula that incorporates three factors: (1) an "inflation factor," which is the percentage change in the Gross Domestic Price Index from the preceding year, (2) a "productivity factor," which is a constant factor·set at 4.5 percent, and (3) an "exogenous change factor," which reflects certain extraordinary changes in costs that are beyond NYNEX's control. *Id.* These factors are expressed as percentages and used in a formula that calculates the PRI by adjusting the base average prices annually. *Id.*

[¶ 10] The productivity factor was designed to create an incentive for NYNEX to reduce costs. The Commission determined that an annual 4.5 percent increase in productivity was a target that NYNEX could reasonably be expected to achieve, but which would still put pressure on the

company to increase efficiency. *Id.* The Commission determined that the productivity factor sufficiently assured ratepayers the benefit of increased efficiency. *Id.* at 53.

[¶ 11] As long as its revenue from core services did not exceed the revenue cap, NYNEX could set the rates for individual services. *Id.* at 60. The Commission identified certain factors that it believed would lead to efficiency gains under the AFOR:

- NYNEX would not be able to file annual rate cases; it cannot rely on rate increases to catch up with whatever costs it incurs; to earn a reasonable return on its investment, it must achieve cost levels consistent with the Price Regulation Index (PRI);
- The Commission would not initiate rate investigations against NYNEX for at least five years. If NYNEX increases its sales or reduced its costs by more than the PRI, it retained the extra profits;
- NYNEX had increased pricing flexibility for discretionary "core" services and for all "non-core" services;
- NYNEX would be in an improved position to compete; and
- In general, NYNEX would bear greater risk for its investments than under traditional ROR regulation.

*Id.* at 4.

[¶ 12] Two unanticipated events occurred during the term of the AFOR. First, the merger of NYNEX with BellAtlantic resulted in the creation of BellAtlantic Maine. The Commission approved the merger, anticipating that cost savings created by the merger would eventually be passed on to ratepayers. *See Re New England Tel. & Tel. Co.,* Proposed Joint Return for Reorganization Intended to Effect the Merger with BellAtlantic Corp., No. 96–388, Order—Part 2 at 8 (Me.P.U.C. Feb. 6, 1997) (hereinafter *Merger Order* ).

It was not clear, however, when and how the savings would be shared with ratepayers. *Id.* at 8–9. The Commission observed that "the NYNEX merger with BellAtlantic is an example of the cost-reducing activity that the AFOR was designed to encourage, and that capture of cost savings at this point in time would significantly impair the efficiency incentives under the AFOR." *Id.* at 14. The Commission noted that ratepayers would eventually be entitled to share in some of the cost savings and stated that the issue should be revisited upon the renewal of the AFOR in 2000. *Id.* at 9–10.[6]

[¶ 13] The second unexpected event was the legislative enactment of the Access Parity Statute, 35–A M.R.S.A. § 7101–B, which resulted in a substantial loss of revenue to Verizon. Prior to 1997, NYNEX earned substantial revenues from access fees charged to intrastate long-distance carriers.[7] *See Merger Order* at 1. The access rates for intrastate calls are regulated by the Commission, while the access rates for interstate calls are regulated by the Federal Communications Commission (FCC). *See Re New England Tel. & Tel. Co.,* Investigation into Regulatory Alternatives, No. 94–123 (Reopened), Order at 1 (Me.P.U.C. March 17, 1998) (hereinafter *Reopened AFOR Order*). Interexchange Carriers (IXCs) were being charged much less for interstate access because the rate caps set by the FCC for interstate calls were substantially lower than the rate caps set by the Commission for intrastate toll calls. *Id.* On average, NYNEX charged a long-distance service provider only seven cents per minute for interstate access, while it was charging twenty-six cents per minute for intrastate access. The result of this disparity was that the cost of calls from state to state was less per minute than calls within the State.

[¶ 14] The Access Parity Statute required the Commission to "establish and every 2 years reestablish intrastate access rates that are less than or equal to interstate access rates established by the Federal Communications Commission." 35–A M.R.S.A. § 7101–B. The Commission responded to the Legislature's mandate by revising chapter 280 of its rules, which deal with intrastate toll and access rates. NYNEX (and then BellAtlantic after the merger) was required under the new rules to gradually reduce its intrastate access rates to the level of interstate rates by May 1999.[8] The Commission allowed

---

6. Despite some concerns over whether the merger would delay the development of a fully competitive market within the State, the Commission determined that some loss of competition was offset by the substantial cost savings that ratepayers would enjoy due to the merger. *Merger Order* at 6–7. The Commission foresaw the savings being passed on to the ratepayers in "at least" three ways: (1) the cost savings will allow NYNEX to lower its rates in response to competition that will likely develop for certain services, (2) the Commission could adjust the productivity index at the five-year AFOR review, and (3) the Commission could impute savings from the merger even if they do not materialize. *Id.* at 9–10. The Commission recognized that ratepayers would inevitably enjoy savings, but concluded that none of these factors would produce immediate savings for consumers. It

determined that, although NYNEX would not realize any savings for several years and would still incur the costs of the merger, ratepayers would be insulated from such costs. *Id.* at 9.

7. Intrastate toll calls are calls between locations within the same state but not within the same local calling area, whereas interstate toll calls are calls between locations in different states. Me. Pub. Utilities Comm'n Reg. 280.1(I). Interexchange Carriers (IXCs), commonly known as long distance companies, provide long-distance service for both interstate and intrastate calls. *Id.* at 280.1(F).

8. Contrary to NYNEX's contention that the AFOR prohibited any change in revenue from any of its services, we upheld the Commission's determination that the AFOR permitted

NYNEX to increase its basic service rates by $3.50 per month per customer to offset the revenue losses resulting from lower access rates charged directly to IXCs. *See Reopened AFOR Order* at 7.

[¶ 15] During the first five years of the AFOR, the PRI was always negative because productivity was higher than inflation. Accordingly, with the exception of the increase to offset the losses to NYNEX resulting from the enactment of the Access Parity Statute, no increase to retail toll or local rates occurred under the AFOR. During the period of the AFOR plan, the FCC reported that consumer prices for all telephone services increased nationally.

## II. PROCEDURAL HISTORY

[¶ 16] In December of 1999, at the end of the five year AFOR, the Commission opened an investigation, the ultimate result of which were the orders that are the subject of this appeal, to determine whether to extend, continue, renew, or modify the then existing AFOR plan. Despite requests by the Public Advocate, the Commission declined to conduct a full rate-of-return investigation or revenue requirement proceeding. The Commission concluded that "[section 9103(1)] does not specifically require [it] to conduct a rate case; rather, it requires the Commission to ensure consistency with the nine objectives stated in [s]ection 9103." *Re BellAtlantic–Maine*, No. 99–851 at 4 (Me. PUC, June 20, 2000) (hereinafter *Order Denying Revenue Investigation*). The Commission concluded that it had discretion to determine whether to conduct such a proceeding, and that such a full rate-of-return proceeding would, in this case, "undermine one of the basic purposes of incentive reg-

ulation: to break the link between costs and prices." *Id.*

[¶ 17] Ultimately, the Commission revised the existing AFOR. *Id.* at 1. The Commission determined that Verizon should retain flexibility in pricing for its retail toll and discretionary services because the retail toll market was competitive, and the discretionary market demand was very sensitive to price changes. *Id.* at 7–8. The Commission also determined that local service, directory assistance, and operator services were not competitive and, accordingly, the Commission regulated those rates, but allowed a further increase of $1.78 per month as a result of the Access Parity Statute.

[¶ 18] The Commission abandoned the PRI. The Commission found it likely that productivity gains would continue at a rate consistent with the first five years of the AFOR plan. *See id.* at 8. Because these gains would exceed inflation, the Commission concluded that Verizon could absorb further losses in retail toll revenue, notwithstanding Verizon's contention that such losses would be substantial. *Id.* at 11–12. It is from the orders establishing the modified AFOR plan and allowing Verizon to increase local rates to offset reductions in revenue from the decrease in access rates charged that the Public Advocate appealed to this Court.

## III. STANDARD OF REVIEW

[¶ 19] The Commission has substantial discretion in the regulation of utilities. *See New England Tel. & Tel. Co. v. Pub. Utils. Comm'n*, 448 A.2d 272, 279 (Me.1982). We will overturn a decision or order of the Commission only when it abuses that discretion, fails to follow a

the Commission to modify the regulations in chapter 280 so that, pursuant to the Access Parity Statute, it could establish an immediate

reduction in certain access rates. *See New England Tel. & Tel. Co.*, 1997 ME 222, ¶ 8, 705 A.2d at 709. *See also supra* note 2.

statutory mandate, or violates the constitution. *Indus. Energy Consumer Group v. Pub. Utils. Comm'n,* 2001 ME 94, ¶ 11, 773 A.2d 1038, 1041. Although the Commission's interpretation of a statute that it administers is not conclusive or binding on us, such an interpretation is entitled to deference and should be upheld unless the statute "plainly compels a contrary result." *Madison v. Pub. Utils. Comm'n,* 682 A.2d 231, 234 (Me.1996).

## IV. WHETHER 35–A SECTION 9103(1) REQUIRES THE COMMISSION TO CONDUCT A REVENUE REQUIREMENT HEARING

■ [¶ 20] Section 9102 authorizes the Commission to "adopt, after public hearings and other processes the commission determines appropriate, an alternative form of regulation for any telephone utility in the State." 35–A M.R.S.A. § 9102. Section 9103 directs the Commission to "ensure that any alternative form of regulation that it adopts pursuant to section 9102 is consistent with" several objectives. Most relevant to this appeal is the directive that "ratepayers as a whole, and residential and small business ratepayers in particular, [will] not be required to pay more for local telephone services as a result of the implementation of an alternative form of regulation than they would under traditional rate-base or rate-of-return regulations." *Id.* § 9103(1). The Public Advocate argues that, prior to adopting an AFOR, the Commission must conduct a rate-of-return inquiry because such a full inquiry is the only practical way for it to determine what rates would be under a ROR system of regulation and, thus, the only way for the Commission to ensure that rates under an AFOR would

be no higher. We are unpersuaded that the statute requires such a full inquiry.

[¶ 21] There is no express requirement in section 9103 or in other statutory language requiring the Commission to undertake a full rate-of-return inquiry prior to approving an alternative form of regulation. Further, section 9103(2) provides that "[t]he costs of regulation of telephone utilities must be less under the alternative form of regulation than under rate-base or rate-of-return regulation." Although section 9103(2) should not be construed as eliminating all rate-of-return inquires,[9] a full rate-of-return regulation inquiry is a time consuming and expensive procedural undertaking.

[¶ 22] The Commission must ensure that any adopted AFOR is consistent with section 9103's objectives, and it has discretion to decide how best to carry out that obligation. Section 9103 does not specify a particular procedure that the Commission must follow in order to make the ensurances required by section 9103. Rather, section 9102 gives a wide degree of latitude to the Commission, allowing it to adopt an AFOR plan "after public hearings and *other processes the commission determines appropriate* ...." 35–A M.R.S.A. § 9102 (emphasis added); *see Pub. Advocate v. Pub. Utils. Comm'n,* 655 A.2d 1251, 1253 (Me.1995) (holding Commission enjoys wide discretion to decide which methodologies and procedures to employ when discharging its responsibilities). The plain language of the statute does not require the Commission to conduct a revenue requirement inquiry each time it adopts or renews an AFOR, and we decline to read such a requirement into section 9103.

9. Conducting revenue requirement proceedings every five or ten years would be less expensive than conducting them annually, and the literal language of section 9103(2) would not be undermined if the Commission were to conduct a revenue requirement inquiry before approving a new AFOR or extending an existing AFOR.

## V. WHETHER THE COMMISSION FULLY COMPLIED WITH SECTION 9103(1)

[¶ 23] At the heart of this appeal is the requirement that, under an AFOR, ratepayers will "not be required to pay more for local telephone services . . . than they would under a traditional rate-base or rate-of-return regulation." 35–A M.R.S.A. § 9103(1).[10]

■ [¶ 24] The ensurance that has to be made pursuant to section 9103(1) is more than a *probability* that the AFOR will not require ratepayers to pay more than under a ROR system. Section 9103, as originally submitted to the Legislature, provided in its opening section that "[i]n determining the alternative form of regulation adopted pursuant to section 9102, the commission shall seek the following objectives." L.D. 1947, § 1 (116th Legis.1994). The original objective set out in section 9103(1) provided that, during the AFOR, ratepayers "are *not likely* to be required to pay more for local telephone services over the period under the alternative form of regulation than they would under traditional rate base or rate-of-return regulation." *Id.* (emphasis added). The language, however, was amended prior to enactment to require that the objective be ensured with more certainty than a likelihood. *See* P.L. 1993, ch. 638 § 2. The amendment required the Commission to ensure that ratepayers would not pay more for basic service than they would otherwise pay under a ROR system. *Id.* The purpose of the amendment was to ensure that the bill would "[s]pecifically provide[ ] that ratepayers, as a result of the implementation of the alternative form of regulation, will not pay more for local telephone service." L.D.1947, Statement of Fact (116th Legis.1994).

[¶ 25] Ensuring the objectives with the certainty required by section 9103 is no easy task. The Commission points out that there are inherent and basic differences between regulation under a ROR system and incentive-based regulation, and contends that the nature of a ROR inquiry would "undermine one of the basic purposes of incentive regulation: to break the link between costs and prices." *Order Denying Revenue Investigation* at 4. ROR regulation is inherently different from incentive-based regulation.

■ [¶ 26] The Commission also notes that a comparison between what local telephone rates would be under a ROR system during 2001–2006, had the 1995 AFOR never been adopted, with what rates are anticipated to be under the proposed AFOR, would be almost impossible.[11] We do not construe section 9103 as requiring such a comparison, however. Ratemaking is a forward-looking exercise. The Commission is required to ensure that, over the next five years, rates under the proposed AFOR will be no greater than what rates would be under a *return* to a system of ROR regulation. The Commission must, pursuant to section 9103(1), determine whether returning to a ROR system *now* would mean that ratepayers would pay rates no lower than they will under the new AFOR over the next five years.[12]

---

10. In addition, section 9103(5) requires the Commission to ensure that customers pay only reasonable charges for local telephone services, and 35–A M.R.S.A. § 7303(2), a more general mandate, requires that local telephone rates be as low as possible.

11. The Commission contends, and the Public Advocate agrees, that too many factors must be considered in determining what rates, ab-

sent the first AFOR, would be; thus, an actual price comparison is impossible.

12. The parties disagree about whether the AFOR created by the Order on appeal adopts a new AFOR or merely extends the old. We need not make this determination in order to resolve the question presented in this appeal. In light of the two significant events that took place during the original AFOR, i.e., the

[¶ 27] In making the ensurance that the rates under the AFOR would be no higher than they would be on a return to ROR regulation, the Commission notes and relies on what it considers to be the many advantages of incentive based regulation over rate-of-return regulation. Those advantages reflected in the experience of the first AFOR regulating Verizon, and the benefits of incentive based regulation in other jurisdictions, are legitimate factors for the Commission to consider. A fair reading of section 9103(1), however, contemplates that the Commission will base the rate comparison determination on more than a general comparison of such systems *alone*. To comply with the letter and spirit of section 9103(1), some reliable estimate, based on objective data, of what local rates would be for Verizon in the 2001–2006 period of time under a ROR system is essential. The Commission should consider objective data pertaining to Verizon's financial status, such as the effect of the merger with BellAtlantic, in order to make an adequate comparison of what rates would be under the two different systems of regulation, a comparison that would be subject to meaningful appellate review. The statute does not allow the Commission to choose incentive based regulation of telephone utilities without making a specific determination based on at least some comparison of local rates estimates under the different systems of regulation.

[¶ 28] The Commission has great expertise and broad discretion. It has many ways of gathering information and applying its expertise to analyze and assess information that it gathers in complying with the objectives of section 9103 that do not necessarily require a *full* rate-of-return inquiry.

[¶ 29] The Commission, however, may finally conclude that it cannot make the ensurance required by section 9103(1), regardless of what kind of investigation it conducts, and further conclude that it is better to proceed with the AFOR without fully complying with the literal language of section 9103(1). If so, section 9103 allows the Commission to adopt an AFOR if it "specifically finds that [full technical compliance with section 9103(1) is] not in the best interests of ratepayers," and reports those findings to the legislature in its annual report on the AFOR. 35–A M.R.S.A. § 9103. Because it has not yet either made those findings and reported them to the Legislature, or found, based on a reliable process, that the rates under the AFOR will be no higher than they would be on a return to ROR, the Commission has not completed its responsibilities and the AFOR must be set aside.

The entry is:

Order creating the alternative form of regulation vacated. Remanded to the Commission for further proceedings consistent with this opinion.

merger with BellAtlantic and the enactment of the Access Parity Statute, along with the modifications made to the original AFOR plan, the Commission is required to comply with section 9103 regardless of whether the plan implemented over the next five years is a new plan or merely an extension of the original plan.