2005 ME 15

**OFFICE OF PUBLIC ADVOCATE
et al.**

v.

**PUBLIC UTILITIES COMMISSION
et al.**

Supreme Judicial Court of Maine.

Argued: May 12, 2004.
Decided: Jan. 26, 2005.

Gerald F. Petruccelli (orally), Petruccelli, Martin & Haddow, L.L.P., Portland, for OPA, appellant.

William C. Black, Wayne R. Jortner, Office of Public Advocate, Augusta, Robert S. Frank (orally), Harvey & Frank, Portland, for AARP, appellant.

Peter G. Ballou (orally), Joanne B. Steneck, Public Utilities Commission, Augusta, Catherine R. Connors (orally), William D. Hewitt, Pierce Atwood, Portland, for Verizon.

Donald W. Boecke, Verizon New England, Boston, MA, for appellee.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, and CALKINS, JJ.*

SAUFLEY, C.J.

[¶ 1] At issue in the present case is the method by which the Public Utilities Commission sets the rates that telephone companies may charge their ratepayers. Specifically, we are called upon to determine whether the Legislature intended to authorize the Commission to approve alternative forms of rate regulation without making a good faith attempt to compare the rates obtainable under those regulations with the rates that would be projected under traditional rate-of-return proceedings.

[¶ 2] The Office of Public Advocate and the American Association of Retired Persons challenge the Commission's determination that no comparison was required. We conclude that the Commission failed to compare the rates generated using the alternative method of ratemaking with the rates that would have been projected using a traditional method, as required by statute. We vacate the rates set by the Commission and remand the matter to the Commission for further proceedings.

## I. BACKGROUND

[¶ 3] The telephone industry has traditionally been a highly regulated industry. Because of the historic monopolies held by one or two companies, the rates charged to consumers have been tightly controlled by the Commission, which acts only through the authorization of the Legislature.[1] 35–A M.R.S.A. § 103(2) (1988 & Pamph. 2004); *Me. Pub. Serv. Co. v. Pub. Utils. Comm'n*, 524 A.2d 1222, 1226 (Me.1987) ("The Commission's powers are derived wholly from statute.").

[¶ 4] In the regulation of telephone rates, there are three different types of rates at issue: local calling rates, intrastate long distance calling rates, and interstate calling rates. *See* 35–A M.R.S.A. §§ 301, 7106, 7303–A, 7307 (1988 & Pamph. 2004). A primary focus of the Legislature and the public, through referendum, has been the goal of keeping local calling rates low and predictable. *See* 35–A M.R.S.A. § 7303 (1988) (passed by referendum and enacted by P.L. 1987, ch. 141, § A(6)); *see also* 35–A M.R.S.A. §§ 9101–9105 (Pamph. 2004). As a consequence, rates for local calls must be flat rates, and the Legislature has historically focused on keeping local rates at "as low a cost as possible." 35–A M.R.S.A. § 7303(2).

---

* Calkins, J. did not sit at oral argument but did participate in the development of the opinion. Levy, J. sat at oral argument but did not participate in the development of the opinion.

1. Statutory regulation of the telephone industry is found at 35–A M.R.S.A. §§ 7101–7904, 8701–9105 (1988 & Pamph. 2004).

[¶ 5] Until 1993, the Commission engaged in frequent reviews of the rates that telephone companies could charge for local and intrastate calls. *See Office of Pub. Advocate v. Pub. Utils. Comm'n (PUC I)*, 2003 ME 23, ¶ 2, 816 A.2d 833, 835–36. That rate review process was known as a rate-of-return case, or "ROR." *See* 35–A M.R.S.A. §§ 301–312 (1988 & Pamph. 2004); *see also* 9 C.M.R. 65 407 120–11 § 5(C)(7) (1999). This traditional type of rate setting generally took place when a telephone utility sought to change "rates, tolls and charges ... the effect of which [was] to increase the annual operating revenues of a public utility by more than 1%." 35–A M.R.S.A. § 307 (1988 & Pamph. 2004). Such ROR proceedings were permitted as frequently as once a year. *Id.*

[¶ 6] The primary focus of an ROR case was the establishment of a reasonable rate of return to the phone company balanced against reasonable charges to the consumers. *See* 35–A M.R.S.A. § 301 (1988 & Pamph. 2004). The RORs required intricate analyses of the utility's expenses, revenues, debts, and operations. 9 C.M.R. 65 407 120–10 to 120–12 § 5 (1999); *see generally* 35–A M.R.S.A. §§ 301–312.[2]

[¶ 7] Because the ROR rate setting process was considered costly, time consuming, and resistant to innovation, the Legislature authorized the Commission to experiment with different types of ratemaking or Alternative Forms of Ratemaking (AFOR). 35–A M.R.S.A. §§ 9101, 9102; *see* L.D. 1947, Statement of Fact (116th Legis. 1994) (stating the purpose was to "preserve[ ] affordable universal service while encouraging the development of new and expanded telecommunications services in the State"). In general an AFOR is intended to focus less on the immediate confirmation of an appropriate rate of return for the telephone company, and more on longer-term income incentives for the telephone company, designed to encourage improved service and low rates for the ratepayers. *See* 35–A M.R.S.A. §§ 9101, 9103. One of the benefits of the AFOR method of setting rates is the authorization to review the rates much less frequently. Instead of conducting a new rate case as frequently as once each year, the Commission is only required to review AFOR rates every five to ten years. *Id.* § 9103(1). This approach combines the benefits of allowing longer-term incentives to work in the marketplace and reducing the regulatory costs that would be passed on to the consumer.

[¶ 8] To authorize this alternative approach to rate setting, the Legislature enacted chapter 91 of title 35–A, which permits the Commission to adopt an AFOR if certain conditions are met. 35–A M.R.S.A. §§ 9101–9105. In 1995, the Commission adopted the first AFOR for telephone service in Maine. *PUC I*, 2003 ME 23, ¶ 7, 816 A.2d at 837–38. It was intended to remain in effect for five years with a possible extension for up to five additional years. *Id.* When that AFOR came up for its five-year review, the Commission was asked by the Public Advocate to undertake an ordinary ROR analysis for the purpose of comparing the prospective local rates under an ROR and an AFOR. *Id.* ¶ 16, 816 A.2d at 840. The Commission declined to compare the rates to determine whether the ratepayers would "pay more for local telephone services as a result of the implementation of an alternative form of regulation than they would under traditional rate-base or rate-of-return regulation."

---

**2.** A more complete description of the ROR process appears in our earlier decision, *Office of Public Advocate v. Public Utilities Commission (PUC I)*, 2003 ME 23, ¶ 2, 816 A.2d 833, 835–36.

35–A M.R.S.A. § 9103(1); *see PUC I*, 2003 ME 23, ¶ 16, 816 A.2d at 840. It then entered a new modified AFOR order to control rates for the next five years. *Id.* ¶¶ 16–17, 816 A.2d at 840. The Public Advocate appealed from that decision. *Id.* ¶ 18.

[¶ 9] Because the Commission failed to undertake even a cursory comparison of the local rates that would be set under an ordinary ROR proceeding, we vacated the order by which the Commission adopted an AFOR pursuant to chapter 91 of title 35–A. *PUC I*, 2003 ME 23, ¶¶ 20–29, 816 A.2d at 841–43.[3] We held that the Commission failed to comply with the mandate of 35–A M.R.S.A. § 9103, which "does not allow the Commission to choose incentive based regulation of telephone utilities without making a specific determination based on at least some comparison of local rates estimates under the different systems of regulation." *Id.* ¶ 27, 816 A.2d at 843. We remanded the matter to the Commission for further proceedings consistent with our opinion. *Id.* ¶ 29, 816 A.2d at 843.

[¶ 10] Following the remand, the Commission issued a notice of further proceedings. The Public Advocate and AARP, which was granted intervenor status, first argued that because we vacated the AFOR, the Commission should order that the rates return to their pre-AFOR levels until the Commission reached a final decision on remand. Verizon disagreed, arguing that because we concluded that "the Commission acted within its discretion in allowing Verizon to increase its basic service rates" by $1.78, *PUC I*, 2003 ME 23, ¶ 1, 816 A.2d at 835, the interim order

should retain the AFOR rate including the $1.78 rate increase. The Commission issued an order allowing Verizon to continue charging its existing rates, including the $1.78 increase.[4]

[¶ 11] In addition to the dispute about the $1.78 rate increase, the parties disputed whether the Commission was required to seek out or accept additional evidence concerning comparative rate calculations and the Public Advocate and AARP argued that our opinion required the Commission to base its decision on objective verifiable evidence comparing rates under the different regulatory systems.

[¶ 12] In August 2003, the Commission issued a procedural order stating that it was planning to finally decide the issues raised by the remand in September based on the briefs of the parties and the existing record. The Commission instructed that the parties could submit comments, request oral argument, or offer to submit any additional materials upon providing details about the content of those materials. The Commission also presented its estimates of Verizon's rate base and return on investment for each of the three prior years.

[¶ 13] AARP submitted a response to the procedural order in which it requested that the Commission consider exercising its investigatory powers to gather more information. A few days after the order, the Public Advocate requested data from Verizon; Verizon objected because, it argued, the information relevant to a rate case was unnecessary.

---

3. The facts and procedure of the prior appeal are laid out in our earlier opinion. *PUC I*, 2003 ME 23, ¶¶ 2–18, 816 A.2d at 835–40.

4. The Public Advocate and AARP both filed interlocutory appeals from the order and the Public Advocate moved to stay the effect of the order. We denied the stay, and the Public Advocate and AARP ultimately stipulated to dismissal of the appeals.

[¶ 14] The Public Advocate also requested in writing that the Commission investigate because more information was needed regarding Verizon's debt and capital, as well as its return on equity. The Public Advocate included an offer of proof to the Commission, describing the proposed testimony of three experts.[5] Verizon responded with a letter to the Commission in which it argued that a full rate case is not necessary to adopt an AFOR and that a comparison of local rates under the AFOR versus traditional ratemaking was not required.

[¶ 15] After receiving the letters and memoranda of the parties, and without conducting an evidentiary hearing or hearing oral arguments, the Commission ordered the reinstatement of the AFOR on September 25, 2003. The Commission reasoned that it was not in the best interests of the ratepayers to reach the degree of certainty contemplated by section 9103. According to the Commission, "to comply with the literal meaning of section 9103(1), [the Commission] would need not only something approaching a full rate case ... but also accurate forecasts of what subsequent rate cases would produce over the period of an AFOR." The Commission emphasized that the changing telecommunications market, increasingly dominated by wireless and other services, made it impossible to predict local wire line rates for the five years of the AFOR. In addition, the Commission reasoned that even if the AFOR were more expensive to ratepayers in the first year, it could still be less expensive over the duration of the AFOR.

[¶ 16] The Public Advocate filed a notice of appeal in which it raised statutory and due process issues. AARP also appealed.

## II. DISCUSSION

[¶ 17] The basic question before us is this: when the Legislature authorized the Commission to dispense with the comparison of local rates only if it finds that approach to be "in the best interests of the ratepayers," 35-A M.R.S.A. § 9103, did it intend to allow the Commission to dispense with the comparison in essentially all future rate setting proceedings? We conclude that it did not and that the record does not support the Commission's finding regarding the best interests of the ratepayers.

### A. Standard of Review

[¶ 18] "Although the Commission's interpretation of a statute that it administers is not conclusive or binding on us, such an interpretation is entitled to deference and should be upheld unless the statute 'plainly compels a contrary result.'" *PUC I*, 2003 ME 23, ¶ 19, 816 A.2d at 841 (quoting *Town of Madison, Dep't of Elec. Works v. Pub. Utils. Comm'n*, 682 A.2d 231, 234 (Me.1996)). We will overturn a decision if the Commission fails to follow a statutory mandate or if it commits an unsustainable exercise of its discretion. *Id.* ¶ 19, 816 A.2d at 840–41.

[¶ 19] The issues raised by the Public Advocate and AARP concern matters of statutory interpretation. The Public Advocate and AARP do not challenge the Commission's factual findings, which, by definition, have not changed in the interim because the Commission did not hold a further hearing. Rather, the Public Advocate and AARP contend that those find-

---

5. The experts were prepared to testify that: (1) Verizon was "earning a return in excess of its cost of capital" and the Commission must take into account important factors that went beyond Verizon's earnings statements; (2) to properly state Verizon's earnings and its revenue requirements, adjustments and more information were necessary; and (3) while the cost of providing local service in Maine has declined, Verizon's rates have increased.

ings, as well as the Commission's legal conclusions, were not made in a manner consistent with the relevant telecommunications statutes and the 2003 opinion, *PUC I*, 2003 ME 23, 816 A.2d 833. As a result, we review the Commission's decision to determine whether the statutes compel a different interpretation than that adopted by the Commission.

## B. Adequacy of Notice of Appeal From Section 9103 Determination

[¶ 20] The Commission argues that the Public Advocate failed to raise arguments regarding any subsections of section 9103 other than subsection 1 in the notice of appeal, as required by 35–A M.R.S.A. § 1320(4) (1988), and, to the extent such arguments were made, the appeal was not timely.

[¶ 21] Section 1320, which governs judicial review of the Commission's actions, requires that the notice of appeal be accompanied by, inter alia, "a statement of the grounds upon which the order or ruling is claimed to be unlawful." 35–A M.R.S.A. § 1320(4). When a party fails to timely denominate an issue in the notice of appeal, the issue is not preserved for appellate review. *AARP v. Pub. Utils. Comm'n,* 678 A.2d 1025, 1032 (Me.1996).

[¶ 22] The Public Advocate's notice of appeal includes the argument that the Commission has misinterpreted section 9103 to permit the Commission to dispense with conditions set forth in the statute. We conclude that the Public Advocate's notice was sufficient to raise the issues that are now before the Court. We therefore address them in this appeal.

## C. Purposes of the AFOR Statutes

[¶ 23] The Public Advocate and the Commission agree that the AFOR statutes were designed to promote telephone utili-

ties' heightened efficiency and innovation in an increasingly competitive industry, ultimately resulting in savings to the ratepayers. To this end, an AFOR remains in effect for a five- to ten-year term during which the telephone utility enjoys the benefit of any cost savings it achieves over and above the savings assumed in the AFOR and the ratepayers enjoy the benefit of being insulated from increased rates resulting from annual rate cases and upward cost fluctuations. The AFOR also decreases regulatory costs by avoiding the annual rate cases that arose under the traditional ratemaking process.

[¶ 24] The Public Advocate contends, however, that the Commission misinterprets the AFOR statutes as severing the link between the price of local service for the ratepayers and the cost to the utility of providing that service. The Public Advocate urges us to interpret chapter 91 as *reinforcing* the connection between rates and costs by requiring that

(1) the price must be as low as possible; (2) it must not be higher than it would be in a rate-base determination; (3) it must be reasonable; (4) it must be sufficient to cover the utility's cost; and (5) it must not be so high that it is a mechanism for transferring the risk of non-local or unregulated business activities.

*See* 35–A M.R.S.A. §§ 7303, 9103.

[¶ 25] Both arguments hold some truth. As the Public Advocate argues, reaching the decision to *adopt* an AFOR requires that the Commission compare rates and costs under the proposed AFOR with rates that would be set pursuant to traditional ROR ratemaking. 35–A M.R.S.A. § 9103. The Commission, however, is correct to the extent that *once adopted,* an AFOR severs the direct link between rates and costs as determined through traditional ratemaking. Instead,

the AFOR encourages increased efficiency by permitting the telephone utility to reap at least some of the benefit of its innovations and heightened efficiency.

[¶ 26] Because the order on appeal in the present case concerns the *adoption* of the second AFOR, we conclude that the Commission's decision to extend the original AFOR does require an analysis of the linkage between rates and costs. The comparison of rates is required before the Commission adopts an AFOR except in the most extraordinary of circumstances, when dispensing with the comparison would be in the ratepayer's best interests. The existence of such circumstances has not yet been demonstrated on the present record in this case.

### D. Compliance with Section 9103

[¶ 27] It is in this context that the Public Advocate and AARP contend that the Commission erred as a matter of law when it failed to take evidence and make specific findings as contemplated by our earlier opinion in this case. They also assert that the Commission's finding that it is impossible to comply with section 9103 is incorrect and does not support a determination that it is in the best interests of the ratepayers to adopt an AFOR without making any specific findings.

[¶ 28] In contrast, the Commission and Verizon contend that regardless of any evidence currently available, including the proof offered by the Public Advocate, the outcome will be the same: the Commission cannot make a reliable prediction about the comparative rates for the full five-year span of the AFOR. According to the Commission, the Public Advocate and AARP are advocating for a full rate case, which is not required by statutes or by our opinion in *PUC I*, 2003 ME 23, 816 A.2d 833.

### 1. The Ratemaking Statutes

[¶ 29] When the Legislature authorized the AFOR approach, it recognized that this alternative was in the nature of an experiment in incentive-based financial planning. Acting cautiously, the Legislature placed several restrictions on the Commission should it choose to adopt an AFOR. An AFOR must meet certain objectives enumerated in chapter 91 unless the Commission finds compliance not in the best interests of the ratepayers:

Unless the commission specifically finds that the following objectives are not in the best interests of ratepayers, the commission shall ensure that any alternative form of regulation it adopts . . . is consistent with the following objectives.

**1. Alternative regulation; period.** For the period of the alternative form of regulation, which may not be less than 5 years nor exceed 10 years without affirmative reauthorization by the commission, ratepayers as a whole, and residential and small business ratepayers in particular, may not be required to pay more for local telephone services as a result of the implementation of an alternative form of regulation than they would under traditional rate-base or rate-of-return regulation.

**2. Costs.** The costs of regulation of telephone utilities must be less under the alternative form of regulation than under rate-base or rate-of-return regulation.

. . . .

**4. Safeguards.** The alternative form of regulation must provide adequate safeguards to ensure that risks associated with the development, deployment and offering of telecommunications and related services offered by the telephone utility, other than local telephone services, are not borne by the local tele-

phone service subscribers of the telephone utility and that the utility continues to offer a flat-rate, voice-only local service option.

**5. Reasonable charges.** The alternative form of regulation must ensure that customers pay only reasonable charges for local telephone services.

**6. Reasonable return.** The alternative form of regulation must ensure that the telephone utility has, over the period of the alternative form of regulation, a reasonable opportunity to earn a fair return on the investment necessary to provide local telephone services.

. . . .

35–A M.R.S.A. § 9103.

[¶ 30] In adopting subsection 1, mandating that the AFOR "shall ensure" that the ratepayers do not pay more for local service under the AFOR than under traditional ratemaking, the Legislature made clear its purpose to "[s]pecifically provide[ ] that ratepayers, as a result of the implementation of any alternative form of regulation, will not pay more for local telephone service." Comm. Amend. A to L.D. 1947, No. S–492, Statement of Fact (116th Legis. 1994).[6]

### 2. Section 9103

[¶ 31] In *PUC I*, we directed that "[t]he Commission must, pursuant to section 9103(1), determine whether returning to a ROR system *now* would mean that ratepayers would pay rates no lower than they will under the new AFOR over the next five years." *PUC I*, 2003 ME 23, ¶ 26, 816 A.2d at 842. We made clear that although the Commission properly considered the advantages of AFORs generally, as well as the experience of the first AFOR, section 9103(1) "contemplates that the Commission will base the rate comparison determination on more than a general comparison of such systems *alone*." *Id.* ¶ 27, 816 A.2d at 843. The Commission must make "some reliable estimate, based on objective data, of what local rates would be for Verizon in the 2001–2006 period of time under a ROR system." *Id.* We expressly directed that the Commission "should consider objective data pertaining to Verizon's financial status, such as the effect of the merger with BellAtlantic, in order to make an adequate comparison ... that would be subject to meaningful appellate review." *Id.*

[¶ 32] In fulfilling this duty, the Commission "has many ways of gathering information and applying its expertise to analyze and assess information that it gathers in complying with the objectives of section 9103 that do not necessarily require a *full* rate-of-return inquiry." *Id.* ¶ 28, 816 A.2d at 843. We acknowledged that the Commission "may *finally* conclude that it cannot make the ensurance required by section 9103(1), regardless of what kind of investigation it conducts, and further conclude that it is better to proceed with the AFOR without fully complying with the literal language of section 9103(1)." *Id.* ¶ 29, 816 A.2d at 843 (emphasis added). In that circumstance, we concluded that the Commission might still adopt the AFOR if it specifically found that full technical compliance with section 9103(1) was not in the ratepayers' best interests and reported that finding to the Legislature in its annual report on the AFOR. *Id.*

---

6. Section 9103 therefore dovetails with the chapter 73 provision that requires the Commission to "establish rates for telephone companies which will preserve traditional flat rate local telephone service at as low a cost a possible." 35–A M.R.S.A. § 7303(2) (1988).

Contrary to the Public Advocate's and AARP's contentions, section 7303(1) does not require anything beyond the satisfaction of the section 9103 requirements—specifically, the requirement set out in section 9103(1). *See PUC I,* 2003 ME 23, ¶¶ 23–29, 816 A.2d at 842–43.

[¶ 33] On remand, the Commission undertook no such evaluation of rate comparisons. In effect, the Commission has concluded that, because a traditional rate case could not, almost by definition, forecast revenues and costs with sufficient reliability over the course of multiple years, the comparison required by the Legislature can never be made. It has, by this conclusion, rendered the mandate to undertake a comparison a complete nullity. We disagree with the Commission's analysis. The Legislature certainly understood the limits of an ROR. Indeed, the enactment of the statute authorizing AFORs indicates the Legislature's recognition of some of those limitations. Accepting those limitations, the Legislature nonetheless required the comparison of rates, except in the most extraordinary of circumstances, that is, when the best interests of the ratepayers support that decision not to make a comparison.[7]

[¶ 34] Accordingly, announcing that a traditional rate case could not provide complete and totally reliable rates across a multi-year period proves too much. That fact would exist in all circumstances, and relying on that determination would eliminate the Legislature's carefully established requirement that an effort at comparison be undertaken. The Commission's finding cannot, therefore, support a conclusion that the statute relieves the Commission of its responsibility to attempt the best comparison that can be achieved. To make the determination about whether bypassing the rate comparison is in the best interests of the ratepayers, as well as any determination about the propriety of conducting a full rate case, the Commission must have a more complete record. More

is required to give the Commission a fuller understanding of the rates that would likely be imposed through an ROR, even if the reliability of those estimates diminishes as they are extrapolated out several years.

[¶ 35] Section 9103 simply does not permit the Commission to disregard its mandate to compare rates solely because it is difficult to achieve or because certainty is not possible. Rather, the plain language of the statute mandates that the Commission may only disregard the objectives of section 9103 if meeting the objective is "not in the best interests of ratepayers." 35-A M.R.S.A. § 9103; see DiVeto v. Kjellgren, 2004 ME 133, ¶ 18, 861 A.2d 618, 623 (stating that we look to the plain language of a statute to give effect to the intent of the Legislature). Moreover, the statute requires independent evidence that the best interests of the ratepayers would be served by the AFOR if the section 9103(1) ensurance cannot be made with certainty. PUC I, 2003 ME 23, ¶¶ 27–29, 816 A.2d at 843.

[¶ 36] Whether or not the Commission favors an AFOR as a general matter in the current telecommunications market, its authorizing statute does not permit the Commission to break so decisively from traditional ROR ratemaking. Viewing the AFOR statutes as a whole, it is clear that traditional ratemaking is the fallback position if the AFOR objectives cannot be met, as well as the baseline by which a proposed AFOR or extension must be assessed. See 35-A M.R.S.A. § 9103 (stating that before adopting an AFOR, the Commission "shall ensure" that it meets the section 9103 objectives unless the Commission specifically finds that the objectives are not in the ratepayers' best

7. Those circumstances have not been shown to exist here, where the Commission has simply announced that because an ROR could not provide a reliable comparison across five full years in a volatile industry, an ROR

would be futile and therefore would not be in the best interests of the ratepayers. This near tautology fails to address the best interests of the ratepayers in any meaningful way.

interests); Comm. Amend. A to L.D. 1947, No. S–492, Statement of Fact (116th Legis. 1997) (amending the initially proposed L.D. to "provide[ ] that the Public Utilities Commission is not required to adopt an alternative form of regulation and that nothing in the bill may be construed to require the commission to adopt any alternative form of regulation").

[¶ 37] The Legislature's venture into authorizing AFORs has been cautious and anchored in traditional ratemaking. This is not unusual when a Commission is being authorized to undertake an entirely new method of setting rates that will affect almost every adult in Maine. With the benefit of time and experience, the Legislature may change the Commission's mandate to make a reasonable good faith effort to determine what rates would be under a rate-of-return system of regulation before approving an AFOR. It has not done so yet.

[¶ 38] We must, therefore, remand the matter to the Commission for the Commission to conduct an investigation to enable it to estimate what rates would be under traditional ratemaking.

## D. Increase In Local Service Rates

[¶ 39] The Public Advocate also contends that the Commission erred in incorporat-

ing into the AFOR the $1.78 increase in local rates that the Commission allowed when Verizon's access charges were significantly reduced as a result of the enactment of the Access Parity Statute, 35–A M.R.S.A. § 7101–B(2) (Pamph. 2004).[8] Specifically, the Public Advocate contends that the Commission's decision to permit Verizon to pass the costs on to ratepayers may violate subsections 4 through 6 of section 9103, which provide that an AFOR must safeguard against risks, ensure that charges are reasonable, and allow only a reasonable return on investment for the utility.

▆▆▆▆ [¶ 40] Relying on the doctrine of "law of the case," the Commission contends that we have already affirmed the decision to permit the rate increase, which was contained in an order separate from the reinstatement of the AFOR.[9] However, when an issue was not raised on the initial appeal, nor considered or addressed in our decision, the decision "does not establish the law of the case on that issue." *Raymond v. Raymond,* 480 A.2d 718, 722 (Me. 1984). We conclude that the rate increase remains a live issue. We did not decide that a five-year increase was appropriate. Rather, we concluded that "the Commis-

---

**8.** Section 7101–B requires the Commission to consider reducing intrastate access rates "[a]fter any decrease of interstate access rates by the Federal Government." 35–A M.R.S.A. § 7101–B(2) (Pamph. 2004). The statute defines "intrastate access rates" as "rates that a telecommunications service provider pays for access to a local exchange carrier's facilities and services in order to provide intrastate interexchange service." *Id.* § 7101–B(1). By May 31, 2005, the Commission must "ensure that intrastate access rates are equal to interstate access rates established by the Federal Communications Commission as of January 1, 2003." *Id.* § 7101–B(2)(A). If making the rates equal results in an increase of fifty percent or more in the price of local telephone service, however, the statute provides a mech-

anism for phasing in the lower access rates. *Id.* § 7101–B(2)(B). The statute also provides that the Commission may approve further intrastate access rate reductions if the FCC reduces interstate access rates after January 1, 2003, unless the reduction results in "an increase of more than 50% in local service rates or an increase of more than 50% in the collection rate for the state universal service fund." *Id.* § 7101–B(2)(C).

**9.** The doctrine of the law of the case "requires that, absent a showing of essentially different facts, [our] decision ... on a given issue is to be followed." *Raymond v. Raymond,* 480 A.2d 718, 722 (Me.1984).

sion acted within its discretion in allowing Verizon to increase its basic service rates" in response to the enactment of the Access Parity Statute. *PUC I*, 2003 ME 23, ¶ 1, 816 A.2d at 835. By way of footnote, we remarked: "In order to comply with section 7101–B, the Commission has the authority to order a reduction in access fees charged by NYNEX. It likewise has the authority to allow Verizon to offset some of its losses resulting from the reduced access fees." *PUC I*, 2003 ME 23, ¶ 1 n. 2, 816 A.2d at 835 (citing *New England Tel. & Tel. Co. v. Pub. Utils. Comm'n*, 1997 ME 222, ¶ 7, 705 A.2d 706, 708–09).

[¶ 41] In the context of our analysis in our 2003 opinion, we did not consider whether the Commission's order allowing an *interim* increase in local service rates would be found to be contrary to subsections 4 through 6 of section 9103 upon the more complete analysis required for a second AFOR. On remand to the Commission, the Public Advocate raised its argument regarding subsections 4 through 6 and we review the issue. *See Raymond*, 480 A.2d at 722.

[¶ 42] The setting of the final rate is inextricably intertwined with the Commission's mandate to estimate the rates obtainable under traditional ratemaking before deciding to adopt the AFOR. As with subsection 1 of section 9103, we conclude that further investigation is necessary to ensure that the subsequent AFOR safeguards against risks, *see* 35–A M.R.S.A. § 9103(4); ensures charges are reason-able, *see id.* § 9103(5); and allows only a reasonable return on investment for the utility, *see id.* § 9103(6).

[¶ 43] In sum, the Commission had the authority to approve an interim rate increase because of the access rate legislation codified at section 7101–B. *PUC I*, 2003 ME 23, ¶ 1 n. 2, 816 A.2d at 835. The Commission was not thereby absolved of its duty to ensure that the later adopted second AFOR met the objectives of section 9103, however. To approve the new AFOR incorporating that rate increase, the Commission was required to ensure that the AFOR adopted subsequent to the enactment of section 7101–B would safeguard against risks, ensure rates were reasonable, and allow only a reasonable return to Verizon. *See* 35–A M.R.S.A. § 9103(4)-(6). As with section 9103(1), we remand these issues to the Commission.

## E. Violation of 47 U.S.C.A. § 254(k) (West 2001)

[¶ 44] Finally, the Public Advocate argues that the Commission was required to determine whether the AFOR violates title 47, section 254(k) of the United States Code.[10] The Public Advocate may not raise this issue on appeal because he did not raise the issue in the earlier appeal, *PUC I*, 2003 ME 23, 816 A.2d 833, or in his notice of appeal on this second occasion.[11] *See AARP*, 678 A.2d at 1032.

The entry is:

---

10. The statute provides:
    **Subsidy of competitive services prohibited**
    A telecommunications carrier may not use services that are not competitive to subsidize services that are subject to competition. The [Federal Communications] Commission, with respect to interstate services, and the States, with respect to intrastate services, shall establish any necessary cost allocation rules, accounting safeguards, and guidelines to ensure that services included in the definition of universal service bear no more than a reasonable share of the joint and common costs of facilities used to provide those services.
    47 U.S.C.A. § 254(k) (West 2001).

11. Although the Public Advocate raised the section 254(k) issue with the Commission on remand, the notice of appeal to the Law Court does not identify the issue.

Commission's order vacated. Remanded for further proceedings consistent with this opinion.