## BANGOR HYDRO–ELECTRIC COMPANY

*v.*

## PUBLIC UTILITIES COMMISSION.

Supreme Judicial Court of Maine.

Argued March 8, 1991.
Decided April 4, 1991.

Frederick S. Samp (orally), Andrew Landry, Bangor Hydro–Electric Co., Bangor, for appellant.

Mitchell Tannenbaum (orally), James A. Buckley, Public Utilities Com'n, William C. Perkins, Stephen G. Ward, Public Advocate, Augusta, for appellee.

Kim M. Vandermeulen, Vandermeulen, Goldman, Allen & O'Brian, Augusta, Robert G. Dreher, Deborah S. Smith, Sierra Club Legal Defense Fund, Washington, D.C., for Atlantic Salmon Federation, American Rivers, Maine Audubon Soc.

Before ROBERTS, WATHEN, GLASSMAN, COLLINS and BRODY, JJ.

WATHEN, Justice.

Bangor Hydro–Electric Company ("Bangor Hydro") appeals a final order of the Maine Public Utilities Commission ("PUC") denying without prejudice Bangor Hydro's petition for certificates of public convenience and necessity for two independent hydroelectric generating projects.[1] Bangor Hydro contends that the PUC arbitrarily ignored its own rules and precedents, made findings of fact that were not supported by the evidence, and erred in denying the certificates due to uncertainties created by their premature filing. Finding no error, we affirm the order of the PUC.

On November 22, 1989, Bangor Hydro filed petitions for certificates of public convenience and necessity requesting the PUC to approve three hydroelectric projects along the Penobscot River. The Basin Mills project, which was expected to provide 32 MW of additional capacity by 1999, involved the construction of a new dam and power facility. Construction on the project was not to begin until 1996. The Veazie project, which was expected to add 6 MW of capacity by 1996, and the Milford

---

1. "No electric utility may construct any generating facility ... unless the [PUC] has issued a certificate of public convenience and necessity approving construction." 35–A M.R.S.A. § 3132 (1988 and Supp.1990). Chapter 330 of the Public Utilities Commission Rules and Regulations establishes the filing requirements for petitions of public convenience and necessity for the construction of new generating facilities of more than 1,000 KW.

project, which was expected to add 2 MW of capacity by 1993, were to provide for an increase in the generating capability of currently existing hydroelectric facilities.

On August 17, 1990, the PUC denied without prejudice the Basin Mills and Veazie petitions.[2] *Re Bangor Hydro–Electric Company*, Nos. 89–193 and 89–195 (Me.P.U.C. Aug. 17, 1990). While the PUC found that this decision was warranted solely on grounds of the petitions' prematurity, it also cited Bangor Hydro's failure to pursue least-cost options and demand-side resource planning as an alternative to the projects. In its order, the PUC described the standard used in evaluating petitions for certificates of public convenience and necessity:

> [T]he utility must demonstrate that the power from the new source is needed and that the resource being considered is the most economical or at least it is a part of an overall least cost plan. In addition, the utility must demonstrate that the timing is reasonable.

This is the standard first articulated by the PUC in the 1979 Sears Island order and most recently reaffirmed in the Hydro–Quebec order. *See Re Central Maine Power Co.*, No. 88–111, slip op. at 26 (Me.P.U.C. Jan. 23, 1989) ("Hydro–Quebec order"); *Re Central Maine Power Co.*, No. U.# 3238, slip op. at 6–7 (Me.P.U.C. Dec. 31, 1979) ("Sears Island order"). It is consistent with the PUC's longstanding policy of encouraging the development of qualifying facilities ("QFs")[3] while requiring utili-

ties to pursue a least-cost plan as required by the Maine Energy Policy Act of 1988, 35–A M.R.S.A. § 3191 (Supp.1990) ("MEPA").[4]

■ Bangor Hydro argues that the PUC erred in finding that the company did not allow independent power producers to bid against the Basin Mills and Veazie projects and it did not use the bidding process to minimize costs. These findings of fact "may not be upset on appeal if [they were] supported by substantial evidence in the record." *New England Tel. & Tel. Co. v. Pub. Util. Comm'n*, 470 A.2d 772, 780 (Me. 1984); *accord New England Tel. & Tel. Co. v. Pub. Util. Comm'n*, 448 A.2d 272, 278–79 (Me.1982); *Cent. Maine Power Co. v. Pub. Util. Comm'n*, 414 A.2d 1217, 1232 (Me.1980). It is the duty of the appellate court to "sustain whatever findings *of fact* underlie the [PUC's] ultimate determinations on the basis of all of the evidence of record ... if the findings of fact are not clearly erroneous, i.e., are basically supported by the totality of the evidence of record." *Id.*

■ The PUC found that, although Bangor Hydro had issued a request for proposals, the bidding and negotiation process was far from complete, and the company had no intention of completing the process until the PUC proceeding was over. The PUC could reasonably have based these findings on the evidence presented, including the testimony of Jeffrey A. Jones, Bangor Hydro's Manager of Power Supply,

---

**2.** The Milford petition was approved by stipulation on January 22, 1991.

**3.** QFs are non-utility entities of cogeneration and small power production facilities which, as unregulated electric generation sources, market their power to electric utilities. In 1978, Congress enacted the Public Utilities Regulatory Policies Act, section 210 of which was designed to encourage the development of QFs. Pursuant to section 210, the Federal Energy Regulatory Commission promulgated regulations which, among other things, required electric utilities to purchase electricity from QFs at prices not to exceed their avoided costs and required state regulatory agencies to administer the rules. "Avoided costs" are the incremental costs to an electric utility of electric energy, capacity, load management, and/or conservation measures which, but for the purchase from the QF or QFs,

such utility would obtain from another source. Public Utilities Commission Rules and Regulations Chapter 36 § 1(A)(3).

**4.** The MEPA states:

> The Legislature finds that it is in the best interests of the State to ensure that Maine and its electric utilities pursue a least-cost energy plan. The Legislature further finds that a least-cost energy plan takes into account many factors including cost, risk, diversity of supply and all available alternatives, including purchases of power from Canadian sources. When the available alternatives are otherwise equivalent, the commission shall give preference first to conservation and demand management and then to power purchased from qualifying facilities.

35–A M.R.S.A. § 3191.

who stated that, although a bidding process had begun, it would probably not be completed before this case was concluded. He further admitted that the company had not given bidders an opportunity to bid against these particular hydro projects because these projects were already priced below the avoided costs. Thus, the PUC's findings of fact were basically supported by the totality of the evidence of record and not clearly erroneous.

■ Bangor Hydro contends that the PUC arbitrarily ignored a standard of review articulated in *Re Hiram Hydroelectric Redevelopment Project and Central Maine Power Company*, No. 80–166 (Me. P.U.C. Nov. 24, 1981) ("Hiram order") and reaffirmed in *Re Central Maine Power Company*, No. 85–158 (Me. P.U.C. Dec. 23, 1986) ("Lewiston Falls order"). This so-called "short-cut" standard provides that

a utility can meet its burden [of showing that it meets the requirements for "public convenience and necessity" under 35–A M.R.S.A. § 3132] if it demonstrates (1) that the facility for which approval is sought would have been a qualifying facility ... but for the fact that over 50% of the facility is owned by a utility and (2) that the revenue requirements associated with the facility are below the utility's avoided costs.

Hiram order at 3–4. In the Lewiston Falls order, the PUC approved a stipulation that a need existed for the Lewiston Falls Hydroelectric Redevelopment Project, according to the standard announced in the Hiram order. Lewiston Falls order at 1.

The Hiram order allows small projects essentially owned by utilities to be treated like QFs and awarded certificates of public convenience and necessity if their revenue requirements are below the utility's avoided costs. This order, however, provides no precedent for the present case. In the Sears Island order, the PUC had emphasized the need "to determine ... whether the facilities proposed by the petitioner meet [the] need [for additional generating or transmitting capacity] in the most eco-

nomical and reasonable manner." Sears Island order at 6. Such an inquiry is now mandated following the Hydro–Quebec order and the passage of the MEPA. *See* Hydro–Quebec order at 3; 35–A M.R.S.A. § 3191. In the Hiram order, the PUC failed to determine whether the proposed projects were more economical than other alternatives. Hiram order at 6. Furthermore, the PUC did not even apply the "short-cut" standard, which appeared in dicta, in the Hiram case, limiting the standard to prospective application. Hiram order at 4. Nor does the Lewiston Falls order, by its own admission, serve any precedential value. Lewiston Falls order at 14. At best, this standard of review places small utility-owned projects on an equal footing with QFs. It does not eliminate the need to demonstrate their superiority over other alternatives or the part they would play in a least-cost energy plan. Thus, even if we assume that the PUC is bound by standards of review set forth in prior decisions, it did not err in adhering to the standards articulated in the Sears order, the Hydro–Quebec order, and the MEPA rather than the "short-cut" standard articulated in the Hiram order.

■ The MEPA requires an electric utility to pursue a least-cost energy plan in which preference is to be given first to conservation and demand management and then to power purchased from QFs. *See* 35 M.R.S.A. § 3191. Thus, in deciding whether a proposed project should be granted a certificate of public convenience and necessity, the PUC must determine whether there are conservation or demand-side measures that ought to be implemented instead. Chapter 380 of the PUC's Rules and Regulations provides the standards for electric utility demand-side energy management programs ("DSM programs"). Public Utilities Commission Rules and Regulations, Chapter 380, § 1 ("Chapter 380").[5] In 1987, the PUC adopted the All Ratepayers Test as the measure of cost effectiveness for DSM programs. *Public Utilities*

---

5. A DSM program is "the planned implementation of specific measures, techniques, or innova-

tions designed to conserve energy or capacity." *Id.* § 2(I).

*Commission Rulemaking,* No. 86–81, slip op. at 1 (Me.P.U.C. March 10, 1987).

The "All Ratepayers Test" is an analysis of the overall economic efficiency of the use of ratepayer resources to produce end uses,[6] to determine whether the same end uses can be provided more efficiently with a demand side energy management program than without it, considering the costs and benefits of the program to the utility and to the ratepayers, taken together. *A program satisfies this test if the present value of program benefits exceeds the present value of program costs,* at the time of analysis.

Chapter 380 § 2(A) (emphasis added). Under the MEPA, a DSM program satisfying the All Ratepayers Test should be implemented in preference to additional supply-side projects, including even QFs. Applying these standards, the PUC found that Bangor Hydro had not pursued its required least-cost plan in the area of conservation and demand-side management. Bangor Hydro argues on appeal that the PUC ignored its own rules and the evidence before it in making this finding.

This court has shown considerable deference to the regulatory expertise of the PUC. In one ratemaking case, we stated: "We do not attempt to second-guess the Commission on matters falling within its realm of expertise. Our review is limited to determining in the light of the record whether the Commission's conclusions are unreasonable, unjust or unlawful. The utility has the burden of proving that the Commission has erred."

*Cent. Maine Power v. Pub. Util. Comm'n,* 455 A.2d 34, 38–39 (Me.1983) (quoting *New England Tel. & Tel. v. Pub. Util. Comm'n,* 448 A.2d at 288)). We also accord " 'due consideration to the interpretations of a statute by the department entrusted with its administration....' " *Cent. Maine Power Co. v. Maine Pub. Util. Comm'n,* 436 A.2d 880, 885 (Me.1981) (quoting *Brooks v. Smith,* 356 A.2d 723, 729 (Me.

1976)). Furthermore, the PUC's findings of fact must be sustained unless shown to be clearly erroneous. *See New England Tel. & Tel. Co. v. Pub. Util. Comm'n,* 470 A.2d at 780; *New England Tel. & Tel. Co. v. Pub. Util. Comm'n,* 448 A.2d at 278; *Cent. Maine Power Co. v. Pub. Util. Comm'n,* 414 A.2d at 1232.

The PUC based its finding primarily on the testimony of Steve Linnell and Carroll Lee who presented Bangor Hydro's criteria for determining the cost effectiveness of DSM programs. Bangor Hydro had the burden of persuading the PUC that its proposed projects were superior to conservation or demand-side measures. *See* Hydro–Quebec order at 35–36. The PUC's finding may not be overturned unless Bangor Hydro can demonstrate that the finding was unreasonable, unjust, or unlawful. Examining the totality of the evidence of record, we find no error.

Bangor Hydro fails to show that the PUC ignored the evidence regarding the manner in which the company screens DSM programs. Taken in its entirety, Lee's testimony supports the conclusion that Bangor Hydro conducts its DSM planning according to its own cost-effectiveness criteria, not in compliance with Chapter 380 or the MEPA. When asked whether Bangor Hydro viewed as its responsibility the obligation to implement all cost-effective programs that it could under the All Ratepayers Test, Lee responded, "No, I don't think that is correct." He also indicated that, "as a general rule, as long as long-run marginal rates exceed a utility's long-run marginal costs, it is not appropriate to pay customers to conserve." Because, as Lee testified, Bangor Hydro's long-run marginal rates currently exceed its long-run marginal costs and are likely to continue to do so, the company would not purchase conservation even if the direct costs of conservation were less than the company's avoided cost. Linnell testified concerning the criteria Bangor Hydro uses in selecting programs for inclusion in the company's DSM plan. These criteria are clearly more

---

**6.** "An 'end use' is the light, heat, motor drive, industrial process, or other useful work resulting from electricity supplied by an electric utility or from a non-electric source provided through a demand side energy management program." Chapter 380 § 2(L).

stringent than the All Ratepayers Test. Bangor Hydro has failed to prove that the PUC erred in finding that its DSM resource planning was inadequate.

Finally, Bangor Hydro argues that the PUC erred in denying the petitions for certificates due to uncertainties created by their premature filing. The company contends that the PUC inappropriately required prior approval by the Maine Board of Environmental Protection ("BEP") and that 35-A M.R.S.A. § 3132 requires the PUC to make a determination of public need at this time.

We are unpersuaded by Bangor Hydro's argument that, by tying the issuance of a certificate of public convenience and necessity to the commencement date of construction, the PUC effectively has determined that a utility must obtain required permits from the BEP before it will issue a certificate. Although the PUC acknowledged the environmental controversy surrounding the proposed projects, its order did not condition the issuance of a certificate on the receipt of BEP permits or the resolution of environmental issues. In fact, the PUC declared its decision to be without prejudice and invited Bangor Hydro to resubmit its application at a more appropriate time. Nothing in the record indicates that Bangor Hydro could not have deferred its filings before the BEP until it had prepared a responsible least-cost plan and re-petitioned the PUC for certificates.

 Bangor Hydro's second argument—that section 3132 requires the PUC to make an immediate determination of public need—is in error. The PUC's decision to deny approval for the projects until better information became available was reasonable and well within its authority. The Legislature has provided the PUC with broad discretion in regulating public utilities, including "all implied and inherent powers ... which are necessary and proper to execute faithfully its express powers and functions specified in this Title." 35-A M.R.S.A. § 104 (1988); *see also Cent. Maine Power v. Pub. Util. Comm'n,* 395 A.2d 414, 424 (Me.1978).

Pursuant to 35-A M.R.S.A. § 3132, the PUC must determine whether proposed major power generating facilities serve the public's needs. Before issuing a certificate of public convenience and necessity, it must make specific findings with regard to the need for the proposed facilities. 35-A M.R.S.A. § 3132(6). Such findings are necessarily based on economic projections that are inherently uncertain. In cases such as this, when construction of a major facility is not due to begin for years, the PUC acts within its discretion in refusing to issue a certificate so far in advance. While the PUC could have issued a certificate conditioned on future review, it was not required by statute to do so. In denying the petitions without prejudice, the PUC determined that Bangor Hydro failed, at this time, to persuade the Commission of the public need for the projects. The PUC committed no error in rendering this decision.

The entry is:

Order affirmed.

All concurring.