2008 ME 135

**QUILAND, INC.**

**v.**

**PUBLIC UTILITIES COMMISSION.**

Supreme Judicial Court of Maine.

Submitted on Briefs: May 29, 2008.
Decided: Aug. 28, 2008.

William S. Harwood, Esq., Nora R. Healy, Esq., Verrill Dana, LLP, Portland, ME, for Quiland, Inc.

Joanne B. Steneck, Esq., Andrew S. Hagler, Esq., Maine Public Utilities Commission, Augusta, ME, for Maine Public Utilities Commission.

Patrick J. Scully, Esq., Shana Cook Mueller, Esq., Bernstein, Shur, Sawyer & Nelson, Portland, ME, for Kennebunk, Kennebunkport & Wells Water District.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, LEVY, SILVER, MEAD, and GORMAN, JJ.

GORMAN, J.

[¶ 1] Quiland, Inc. appeals from an order of the Public Utilities Commission that: (1) upheld Kennebunk, Kennebunkport & Wells Water District's individual water metering policy (the Metering Policy) as just and reasonable as applied to property owned by Quiland; and (2) determined that, with certain modifications, the system development charge (SDC) imple-

mented by the District, and applicable to Quiland, would also be just and reasonable. Quiland argues that the Commission erred when it concluded that the Metering Policy is just and reasonable, asserting that the Commission: (1) ignored statutory provisions and its previous rulings that a mandatory water conservation program, such as the District's, must be cost-effective in order to meet the statutorily-required "just and reasonable" standard; (2) failed to follow our instruction to consider all of the relevant factors relating to the Metering Policy, as well as factors relating to the SDC; and (3) allowed the District to apply its Metering Policy to Quiland's property even though the Commission had not previously approved the policy as statutorily required.

[¶ 2] Finding no error with respect to the Commission's order as to the first two issues on appeal, we affirm the Commission's order on those issues without further discussion. *See generally Competitive Energy Servs., LLC v. Pub. Utils. Comm'n*, 2003 ME 12, ¶ 15, 818 A.2d 1039, 1046 ("Generally, decisions of the Commission are reviewed only to determine whether the agency's conclusions are unreasonable, unjust or unlawful in light of the record." (quotation marks omitted)); *see also Bangor Hydro–Electric Co. v. Pub. Utils. Comm'n*, 589 A.2d 38, 42 (Me. 1991) ("This [C]ourt has shown considerable deference to the regulatory expertise of the PUC."). However, the Commission erred when it determined that the District's failure to file the Metering Policy as "part of [its] general Terms and Conditions of service" did not preclude the District from applying it to Quiland's property. We therefore vacate the Commission's

decision as to the third issue on this appeal.

## I. BACKGROUND

[¶ 3] The matter before us is the second appeal brought by Quiland in this case. *See Quiland, Inc. v. Pub. Utils. Comm'n (Quiland I)*, 2007 ME 45, 917 A.2d 697. Because a discussion of the background facts is available in that opinion, we discuss only the factual and procedural background relevant to our analysis of the third issue on appeal here. These facts were found by the Commission and are supported by substantial evidence in the record. *See Bangor Hydro–Electric*, 589 A.2d at 40 (stating that we do not upset the Commission's findings of fact if they are supported by substantial evidence in the record).

[¶ 4] In 1990, the District adopted the Metering Policy that requires individual water metering for all multi-unit developments. Following a 2002 amendment,[1] the Metering Policy provided in 2005:

Metering policy for multifamily units (condominiums, apartments, mobile home parks) and commercial units (condominiums, shopping center and other leased units).

It is the policy of the District to meter each individual unit such as in mobile home parks or when multiple units, either commercial or residential, are located in the same building. In most cases, the water service shall remain private and be owned and maintained by the condominium or home owners association, landlord, or mobile home park owners. Design and construction of the system, including meter placement, the installation of associated valves and

---

1. The Metering Policy was amended in 2002 to allow, but not require, multi-unit seasonal campgrounds and RV parks to be master-metered, in recognition of the fact that the transient nature of users at these sites made it difficult to achieve the benefits of individual metering.

backflow prevention devices shall comply with all District specifications and construction standards. Generally it shall be required that in multiunit buildings, meters for all units shall be placed on one location (for example, in a utility room) with individual control valves and outside registers.

Multiunit, time-share type developments shall normally be individually metered. However, all meters within the same development complex shall be billed to the same individual or group. (A group could include an association, corporations, club, etc.)

This policy is not intended to cover all possible situations but to serve as a general guide to District metering policy.

Multiunit seasonal campgrounds and RV parks may be master metered.

The District never filed its Metering Policy with the Commission as part of the District's terms and conditions because the Commission told the District that it was unnecessary to do so at the time and instead recommended that the Metering Policy be approved by the District's trustees and applied uniformly by the District.

[¶ 5] In September 2004, Quiland, a real estate development company, obtained site approval for "Summer Village," a residential cottage complex consisting of 247 individually-owned seasonal cottages. Quiland applied to the District for water service for Summer Village, to be delivered through a single two-inch master meter. After months of negotiation, the District informed Quiland in December 2004 that it would have to install and deliver water to each of Summer Village's cottages through individual 5/8–inch meters in accordance with the Metering Policy.

[¶ 6] In *Quiland I*, Quiland argued that the Commission erred in not requiring the District to establish that the Metering Policy is cost-effective and that the Commission's order was not supported by sufficient findings or substantial evidence in the record. 2007 ME 45, ¶ 2, 917 A.2d at 698. We dismissed Quiland's appeal as premature, concluding that the Commission needed to conduct further review based on the statutory criteria and reach resolution on a matter relating to the SDC before the issues were ripe for review. *Id.*

[¶ 7] On remand, the Commission reopened the record and consolidated the Metering Policy issue with the SDC revision issue. Quiland argued before the Commission that, among other things, because the District never submitted the Metering Policy for Commission approval as part of its terms and conditions, the Metering Policy is unenforceable. The Commission issued a final order on November 16, 2007, in which it addressed that argument, stating:

As a preliminary matter, we reject Quiland's suggestion that the District is precluded from relying on its written metering policy because it failed to file that policy with the Commission for our approval. Without reaching the issue of whether the policy should have been filed as part of the District's general Terms and Conditions of service, we hold that its failure to do so, even if required, is not fatal in this case for two reasons. First, the record reflects that the District was advised by Commission staff that the policy need not be filed with the Commission. More fundamentally, Quiland suffers no prejudice as a result of the District's decision not to file the policy with the Commission because it has had a full opportunity to challenge that policy in these proceedings.[2]

---

2. The District argues that Quiland raises this argument for the first time and that it is therefore not preserved. We disagree.

[¶ 8] The Commission also made several findings concerning the costs associated with the imposition of the Metering Policy on Summer Village. Based on those findings, the Commission found that the Metering Policy "has the result of imposing . . . two costs upon all of [the District's] seasonal customers." First, the "application of the [M]etering [P]olicy to seasonal complexes brings with it the added cost (as compared to application of the policy to year-round customers) of annually removing and reinstalling the meters." Second, the Metering Policy imposes the cost of initially purchasing and installing individual meters rather than just one master meter. The Commission further found that the Metering Policy "is a just and reasonable term, condition, practice or act of the District" and that the Metering Policy has a "financial impact . . . on the rates and charges of the District. . . ." Quiland appeals from the Commission's decision.

## II. DISCUSSION

 [¶ 9] This appeal turns on statutory interpretation. As we have previously explained:

> When reviewing an agency's interpretation of a statute that is both administered by the agency and within the agency's expertise, we apply a two-part inquiry. First, we determine de novo whether the statute is ambiguous or unambiguous. Ambiguous language is described as language that is reasonably susceptible of different interpretations. Then, we either review the Commission's construction of the ambiguous statute for reasonableness or plainly construe the unambiguous statute. An agency's interpretation of an ambiguous statute it administers is reviewed with great deference and will be upheld unless the statute plainly compels a contrary result. Generally, decisions of the Commission are reviewed only to determine whether the agency's conclusions are unreasonable, unjust or unlawful in light of the record.

*Competitive Energy Servs.*, 2003 ME 12, ¶ 15, 818 A.2d at 1046 (quotation marks omitted).

 [¶ 10] Title 35–A M.R.S. § 304 (2007) provides:

> Every public utility shall file with the [C]ommission, within a time to be fixed by the [C]ommission, schedules which shall be open to public inspection. *The schedules shall show all rates, tolls and charges* which the utility has established and which are in force at the time for any service performed by it within the State, or for any service in connection with or performed by any public utility controlled or operated by it or in conjunction with it. *Every public utility shall file with and as part of its schedules all terms and conditions that in any manner affect the rates charged or to be charged for any service. . . .* All such schedules to be filed with the [C]ommission shall be designated as terms and conditions.

(Emphasis added.)[3] The statute does not define "rates, tolls and charges" or "terms and conditions that in any manner affect

---

3. Telecommunication utilities are exempted from some of the provisions discussed herein pursuant to 35–A M.R.S. § 307–A (2007), which authorized the Commission to exempt these utilities. The Commission did so by rule, finding that telecoms have sufficient competition and that the marketplace provides adequate regulation and safeguards. *Order Adopting Rule and Statement of Factual and Policy Basis*, No. 2007–234 Order (Me. P.U.C. Sept. 5, 2007), 2007 Me. PUC Lexis 244, at *1, 5–8. We note that such an analysis would not apply to exempt the District from these rules because the District has no competition.

the rates charged or to be charged for any service," nor have we found caselaw on point. However, the Commission expressly found in its final order that the Metering Policy is a "term, condition, practice or act." The Commission also found that the Metering Policy has a "financial impact ... on the rates and charges of the District" and that it "has the result of imposing ... two costs [the cost of initially installing each meter and the added costs of annually removing and reinstalling meters] upon all of [the District's] seasonal customers."

[¶ 11] Based on these findings, the Metering Policy is, as a matter of law, a "rate, toll or charge" or constitutes "terms and conditions that in any manner affect the rates charged or to be charged for any service." *See id.* § 304; *see, e.g., Re Bangor Hydro–Electric Co.,* No.2003–761 Order (Me.P.U.C. Nov. 4, 2003), 2003 Me. PUC Lexis 455, at *3 (holding that a charge imposed by a third-party vendor with whom the public utility contracts, though not a public utility rate, affects the utility's rates and therefore must be included in the utility's terms and conditions pursuant to section 304).

[¶ 12] We next consider whether the Commission is granted authority to determine that the District's failure to file its Metering Policy with the Commission before applying it to Summer Village was immaterial because the District had been told by Commission staff that it need not and, "more fundamentally," Quiland suffered no prejudice as a result of the District's "decision not to file the policy with the Commission." Our review of the relevant statutory provisions reveals that each public utility is mandated unambiguously to file schedules with the Commission before these schedules may be applied to utility customers. *See* 35–A M.R.S. §§ 304, 307, 308–309 (2007).

[¶ 13] As noted above, section 304 provides that each public utility "*shall file with the [C]ommission,* within a time to be fixed by the [C]ommission, schedules which shall be open to public inspection[, and] ... [e]very public utility *shall file* with and as part of its schedules all terms and conditions that in any manner affect the rates charged or to be charged for any service." *Id.* § 304 (emphasis added). A utility may not change a schedule unless it has provided notice to, and filed the new schedule with, the Commission thirty days before its effective date. *Id.* § 307 ("No change may be made in any schedule ... except upon 30 days' notice to the [C]ommission, and all such changes must be plainly indicated upon existing schedules by filing new schedules in lieu of them 30 days prior to the time they are to take effect.").[4] In addition, a change in a utility

---

4. There is one exception to the thirty-day advance filing requirement of section 307—the Commission may, for good cause shown, allow changes upon less than the notice specified or modify the requirements of sections 307 and 308, with respect to publishing, posting, and filing of schedules. 35–A M.R.S. § 307 (2007). This exception to section 307's advance filing requirement is inapplicable in this case. First, the Commission made no "good cause" findings in support of its determination that the Metering Policy is enforceable against Quiland despite having not been previously filed with the Commission. Second, even if a utility is deemed to have good cause to file a change in a schedule less than thirty days before its effective date, section 35–A M.R.S. § 309 (2007) nonetheless makes it unlawful for a utility to charge, demand, collect, or receive a greater or lesser compensation than that specified in the schedule in force at the time. Only schedules that have been duly filed with the Commission may be in force. 35–A M.R.S. § 304 (2007). There is no good cause exception to the requirements of sections 304 and 309. Thus, even if the Commission found that the District had good cause to file the Metering Policy less than thirty days before its effective date, the Dis-

schedule cannot take effect unless the new schedule is filed in every office of the utility where payments are made thirty days before the schedule's effective date, unless the Commission prescribes less time pursuant to section 307. *See supra* note 4; *id.* § 308. Finally, it is unlawful for any public utility to charge something different from what is printed on a schedule then in force.[5] *Id.* § 309. Again, a schedule is in force only after it has been filed with the Commission. *Id.* §§ 304, 307, 308.

■ [¶ 14] The statutory language and legislative intent are unambiguous. Each public utility is mandated, with no exception applicable in this case, to file with the Commission a schedule disclosing all rates, tolls, and charges, including all terms and conditions that in any manner affect the rates charged or to be charged for any service, before such a schedule can be applied to a utility customer. *Id.* §§ 304, 307–309. These provisions are non-discretionary, giving no authority to the Commission to dispense with the statutory notification and filing requirements. *See, e.g., Re Gardiner Water Dist. v. Washuk,* No. 98–394 Order (Me. P.U.C. June 16, 1998), 1998 Me. PUC Lexis 754, at *2, 5 (holding that the utility was precluded from imposing a $10 service fee on a customer almost one year before a schedule showing that fee was filed with the Commission as required by 35–A M.R.S. §§ 304, 309).

[¶ 15] Therefore, the Commission erred as a matter of law when it concluded that it is immaterial whether the District failed to file the Metering Policy with the Commission. The Commission's determination that Quiland was not prejudiced by the District's failure to file the Metering Policy is irrelevant under the mandates of title 35–A. Furthermore, even if Commission staff advised the District in 1990 that it need not file the Metering Policy, that does not relieve the District from its obligations under title 35–A. The Commission had no authority under the plain language of the relevant statutory provisions to conclude that, based on equitable considerations, the District's failure to file the Metering Policy with the Commission was not fatal to the application of that policy to Quiland's Summer Village. Accordingly, the Commission's conclusions were in error. *See Competitive Energy Servs.,* 2003 ME 12, ¶ 15, 818 A.2d at 1046; *see also* 35–A M.R.S. § 103(2)(B) (2007) ("The commission shall set the basic policies of the Public Utilities Commission and *shall regulate public utilities in accordance with this Title.*" (emphasis added)); *Office of Pub. Advocate v. Pub. Utils. Comm'n,* 2005 ME 15, ¶ 18, 866 A.2d 851, 856 ("We will overturn a decision if the Commission fails to follow a statutory mandate or if it commits an unsustainable exercise of its discretion.").[6]

The judgment is:

Order of the Commission vacated. Remanded to the Commission for further

---

trict is prohibited from applying the Metering Policy until the policy is actually filed.

5. We note also that, in general, a water utility defined in 35–A M.R.S. § 102 (2007) that is consumer-owned and that elects to set rates under section 6104 may increase or decrease a rate, toll, or charge only if it first holds a public hearing. 35–A M.R.S. §§ 310(3)(A), 6104(2) (2007).

6. The implied powers provision of 35–A M.R.S. § 104 (2007) is not implicated in this case because the relevant statutory sections unambiguously preclude the Commission from discretionarily excusing public utilities from the filing requirements of sections 304, 307, 308, and 309.

proceedings consistent with the holding that the District's failure to file the Metering Policy precludes it from applying that policy to Quiland, Inc.'s Summer Village.