2012 ME 78

**PIKE INDUSTRIES, INC.**

v.

**CITY OF WESTBROOK, et al.**

Supreme Judicial Court of Maine.

Argued: Oct. 11, 2011.
Decided: June 14, 2012.

David W. Bertoni, Esq. (orally), Daniel A. Nuzzi, Esq., and David Swetnam–Burland, Esq., Brann & Isaacson, Lewiston, for appellant Artel, Inc.

David P. Silk, Esq., Curtis Thaxter Stevens Broder & Micoleau LLC, Portland, for appellant Smiling Hill Farm.

Anthony W. Buxton, Esq., Sigmund D. Schutz, Esq. (orally), and William D. Hagedorn, Esq., Preti Flaherty, LLP, Portland, for appellee Pike Industries, Inc.

Natalie L. Burns, Esq. (orally), and William H. Dale, Esq., Jensen Baird Gardner & Henry, Portland, for appellees City of Westbrook, Westbrook Zoning Board of Appeals, and Richard Gouzie.

William L. Plouffe, Esq., Drummond Woodsum, Portland, on the briefs, for appellee Idexx Laboratories, Inc.

David A. Lourie, Esq., Cape Elizabeth, on the briefs, for amicus curiae Birdland Neighborhood Alliance.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

LEVY, J.

[¶ 1] This appeal concerns a consent decree entered into by the City of Westbrook, Pike Industries, Inc., and intervenor IDEXX Laboratories, Inc. to settle a land use dispute arising from Pike's operation of a quarry in Westbrook. Intervenors Artel, Inc. and Smiling Hill Farm, Inc. appeal from the approval and entry of the consent decree in the Business and Consumer Docket (*Humphrey, C.J.*) as a

final judgment in Pike's M.R. Civ. P. 80B appeal and the City's M.R. Civ. P. 80K counterclaim. We affirm the judgment in part and vacate the judgment in part, and remand for further proceedings.

## I. BACKGROUND

### A. Facts

[¶ 2] Pike Industries owns and operates a quarry on property located on Spring Street in Westbrook that it purchased in 2005. Artel, IDEXX Laboratories, and Smiling Hill Farm own property and operate businesses near Pike's property.

[¶ 3] Pike's property comprises several parcels acquired by Pike's predecessors. Quarrying operations began in one location on the property prior to 1940, ending sometime between 1956 and 1964. In 1968, quarrying, including blasting, began at a different location on the property, pursuant to a conditional approval by the City. Since the 1968 approval, the City has not issued any permits to Pike or its predecessors to operate a quarry at the property, but there was substantial quarrying activity there until at least 2009, most of which was known to the City.

[¶ 4] There have been four successive zoning ordinances in effect in Westbrook that regulated the use of the quarry property. The first was adopted in 1951, with superseding ordinances enacted in 1969, 1973, and 2004. In the zone where the Spring Street property is located, the post–1968 ordinances allowed extractive industries, including quarrying, as either a special exception or conditional use requiring approval by the Zoning Board of Appeals (ZBA), the Planning Board, or both. Neither Pike nor its predecessors applied for such approval. However, in 2006 and 2008, Pike applied for, and the Westbrook Code Enforcement Officer (CEO) issued, permits that authorized Pike to conduct blasting at the property.

### B. Process

[¶ 5] In September 2008, IDEXX, having learned that Pike intended to expand its quarrying operations, wrote to the City asserting that Pike had no right to quarry at the property. Pike responded in January 2009, claiming that it had grandfathered rights to operate the quarry. Later that month, the CEO determined that Pike had grandfathered rights to quarry on approximately thirty-two acres of the eighty-acre site, but that it did not have grandfathered rights to engage in rock crushing or operate a concrete or asphalt plant. Pike appealed to the Westbrook ZBA from the CEO's determination that it did not have grandfathered rights to crush rock or manufacture concrete and asphalt. Artel and a neighborhood group that included IDEXX and Smiling Hill appealed the CEO's finding that Pike had grandfathered rights to quarry on the property.

[¶ 6] The ZBA consolidated the appeals, held seven hearings, and issued a decision in July 2009. It concluded that Pike did not have grandfathered rights to operate a quarry, conduct rock crushing, or establish a concrete or asphalt plant on the Spring Street site. The ZBA decided that it did not have jurisdiction to determine Pike's rights under equitable doctrines, including Pike's claim of equitable estoppel. The ZBA did not consider what Pike's potential rights might be under the then-existing land use ordinance.

[¶ 7] Pike appealed to the Superior Court pursuant to M.R. Civ. P. 80B, naming the City, the ZBA, and the CEO as defendants. Pike also asserted independent claims for equitable estoppel, waiver, and laches pursuant to M.R. Civ. P. 80B(i), contending that the City should be enjoined from enforcing its zoning ordinances

against Pike. The City counterclaimed against Pike pursuant to M.R. Civ. P. 80K and 30–A M.R.S. § 4452 (2011), asserting that Pike had violated the zoning ordinance. IDEXX, Artel, and Smiling Hill intervened with the consent of the City and Pike. The suit was transferred to the Business and Consumer Docket, where the Rule 80B appeal and the independent claims were bifurcated for decision, with the court first addressing the 80B appeal.

[¶ 8] In April 2010, the court resolved the 80B appeal by affirming the ZBA's decision. Pike, the City, and IDEXX then initiated negotiations in an effort to settle the remaining issues. In June, the Westbrook City Council separately considered and ultimately approved the rezoning of the district that included the Spring Street property to prohibit extractive industries. In response, Pike filed a separate suit alleging that the rezoning of the property was unconstitutional. Eventually, however, Pike, the City, and IDEXX agreed on the terms of a consent decree, which the City Council approved by a vote taken at a public meeting on September 8, 2010.

## C. The Consent Decree

[¶ 9] The consent decree effectively treats quarrying activity at the Spring Street property as a grandfathered use that is not subject to the Westbrook Zoning Ordinance's current prohibition against extractive industries; adopts performance standards that delimit the use; and establishes a scheme for the enforcement of those standards.[1] In its judgment approving the consent decree, the court ably summarized the terms of the decree:

The proposed Consent Order, if accepted by the court, would resolve Pike's remaining equitable claims, release the settling parties from liability from the

suit, and prohibit the parties from litigating further issues related to the suit other than those specified within the agreement. (Consent Order ¶¶ 9–12.) Once effective, Pike also would dismiss a separate pending Rule 80B proceeding, not before this court, and could then recommence quarrying activity at the Spring Street Quarry, but subject to conditions and restrictions set forth in the Consent Order. (Consent Order ¶ 12.)

### A. Performance Standards

The Consent Order contains numerous and detailed performance standards, prescribing the areas where and the method by which Pike will be able to continue its mining operation. Under the terms of the proposed order, Westbrook cannot require Pike "to comply with or implement any performance standards, management practices or site improvements except as provided [in the consent agreement]." (Consent Order ¶ 53.) Pike would not be able to operate quarrying activities west of Clarke Brook, nor operate an asphalt or concrete plant, and these restrictions would be permanently impressed upon Pike's property. (Consent Order ¶ [¶] 16–17.) Pike would also be required to construct a visual buffer, vegetative buffer, and fence and not allow dust to cross its property line. (Consent Order ¶¶ 22–23, 44.) The hours permitted for crushing would be limited to weekdays 7:00 a.m.– 6:00 p.m.; the hours permitted for trucking limited to weekdays 7:00 a.m. to 5:00 p.m. and Saturdays 7:00 a.m.– 12:00 p.m.; and the amount of truck traffic limited to an average of 45 departures in a single day, calculated annually. (Consent Order ¶¶ 18, 20.[)] The

---

**1.** Although the decree is designated as a "consent order," we use the interchangeable term

"consent decree," which is the term more commonly found in reported decisions.

hours permitted for blasting would be limited to weekdays 10:00 a.m.–3:00 p.m. (Consent Order ¶ 18.) Pike could only conduct 8 production blasts a year, and, if any blasting is necessary for safety, those blasts must be coordinated with production blasts. (Consent Order ¶ 19.)

Further, within the first 6 months of the order, Pike must relocate the quarry entrance and construct a new access road and may conduct up to 10 blasts to accomplish these requirements. (Consent Order[ ] ¶¶ 19, 33–34.) Pike also would be required to "meet with Artel and negotiate in good faith as to any other blasting limitations during [those first 6 months] as are commercially reasonable for Pike to minimize any unreasonable disruption to Artel's on-going business operations." (Consent Order ¶ 19.) In addition, Pike must comply with all current and future blasting permit requirements of the Westbrook Code and conduct all blasting and related operations according to applicable safety standards pursuant to federal, state, and local law. (Consent Order ¶ 19.) Pike must coordinate with the Maine Department of Environmental Protection for investigation and monitoring of its activities and have a third party conduct blast monitoring, off-site seismic monitoring, and pre-blast surveys. (Consent Order ¶ [¶] 24–27.) Finally, Pike must limit vibrations through the use of electronic detonators and laser profiling (Consent Order ¶¶ 35–37), maintain decibels below prescribed levels measured at the property line (Consent Order ¶¶ 39–43), and maintain a blast call list of property owners within ½ mile of the quarry to notify them two weeks in advance of any blasting (Consent Order ¶ 30).

B. *Prospective Application and Dispute Resolution*

The proposed Consent Order provides that it "is intended to and will supersede and control over any different or conflicting provisions of the Westbrook Code of Ordinances now existing or hereafter enacted," and "[i]n the event of a difference or conflict between the terms of this Order and any state or federal requirements, the stricter provision will control and this Order will otherwise remain in full force and effect." (Consent Order ¶ 56.) The agreement, and thus the order, would be binding upon and inure to the benefit of the parties' successors and assigns and contains a re-opener provision that allows the parties to discuss and negotiate in good faith the incorporation of improved mining technologies once every 10 years. (Consent Order ¶ 56.) If the parties do not come to an agreement, the then-current terms of the agreement will continue for another 10 years. (Consent Order ¶ 56.) If a dispute arises between the parties regarding the Consent Order, it shall first be subject to informal negotiations, and then Westbrook may enforce violations pursuant to 30–A M.R.S. § 4452 (2009). (Consent Order ¶¶ 57–58.)

[¶ 10] Pike and the City moved the court to approve and enter the consent decree, and, over the objection of Artel and Smiling Hill, the court granted Pike's motion for a nonevidentiary hearing on the motions for entry. Following the hearing, the court approved the consent decree in a comprehensive decision dated November 22, 2010, that thoroughly addressed all of the arguments posed by Artel and Smiling Hill.

[¶ 11] In its decision, the court noted the public policy favoring the resolution of disputes by settlement and determined that although the consent decree resem-

bled contract zoning, it did not result in an illegal, de facto contract zone in violation of the statutory requirements for contract zoning. The court observed that the consent decree represents "the settlement of legitimate *equitable* claims that the parties have disputed through litigation," and that "[w]hether Westbrook is equitably estopped from enforcing its zoning ordinance against Pike's quarrying and mining operation or whether the doctrine of laches applies are determinations that the court must make." The court ultimately concluded that the consent decree would not result in a de facto contract zone because the City had not acted in its legislative capacity when it entered into the consent decree:

> When the City Council ... votes to enter into a waste removal contract, approves the hiring of a new code enforcement officer, or enters into a settlement agreement of legitimate claims in pending litigation, it acts in an executive capacity, pursuant to the broad powers of administration granted to municipalities by the Maine Constitution's home rule authority for matters which are local and municipal in character.... The City Council's decision and vote to enter into the [c]onsent decree is executive, not legislative in nature and, therefore, it does not constitute contract zoning, illegal or otherwise.

[¶ 12] The court also voiced concern with the practical consequences that would result if it adopted Artel's position that Pike should dismiss the suit and apply for contract zoning approval:

> The logical conclusion of their preferred procedure would prevent a municipality from settling any land use litigation involving a statutorily mandated process, regardless of the risks or costs to the municipality.... In the context of the litigation of Pike's independent claims,

the court believes that the procedure advanced by Artel is neither necessary, nor intended by the Legislature.

[¶ 13] The court concluded that the City had the power to settle Pike's claims as part of its right to sue and be sued; that the opponents to the consent decree received ample notice and an opportunity to be heard; and that it would not "second guess the [City's] judgment that it is in the City's best interest to settle the litigation with Pike rather than risk an adverse result after trial." The court adopted the executed consent decree by an order dated November 23, 2010, and entered it as a final judgment on December 7, 2010. This appeal followed.

## II. DISCUSSION

[¶ 14] The issues raised in this appeal center on the standards and process a court should employ when it reviews a proposed consent decree that will substitute the decree's requirements for the otherwise applicable requirements of an existing land use ordinance. All of the parties agree that, as is true with every court order, a consent decree must not conflict with the requirements of applicable laws, *see Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland,* 478 U.S. 501, 525–26, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986), and that before approving a consent decree, a court must be satisfied that it does not violate the United States and Maine Constitutions, statutes, or other relevant sources of law, *see Durrett v. Hous. Auth.,* 896 F.2d 600, 604 (1st Cir.1990). For purposes of our appellate review, whether a consent decree comports with legal requirements is a question of law that we review de novo. *See Town of Vassalboro v. Barnett,* 2011 ME 21, ¶ 6, 13 A.3d 784 (stating that the interpretation of statutes and ordinances are legal questions reviewed de novo); *Portland Co. v. City of*

*Portland,* 2009 ME 98, ¶ 31, 979 A.2d 1279 (stating that the interpretation of a contract is reviewed de novo).

[¶ 15] Our review leads us to conclude that the court did not err by (A) concluding that the City had the authority to settle this land use litigation through a consent decree that declares Pike's property to be grandfathered under the City's zoning ordinance, (B) applying the standards it considered when reviewing the consent decree, and (C) following the process it employed to review the consent decree. We further conclude, however, that (D) because the consent decree adopts performance standards without those standards having been formalized through a contract zone agreement or by amendments to the land use ordinance, as authorized under the City's home rule authority to regulate land use, the performance standards do not fall within the standards that can be enforced pursuant to the statute that governs land use enforcement, 30–A M.R.S. § 4452. For this reason, the consent decree's enforcement provision—paragraph 57—is itself unenforceable. Because Artel and Smiling Hill did not specifically focus their argument on the unenforceability of the "new zone" pursuant to section 4452, it was not brought to the attention of the trial court. We must vacate the judgment and remand so that the court may afford the parties the opportunity to remedy this defect.

A. The City's Authority to Enter Into a Consent Decree That Declares Property to Be Grandfathered Under the City's Zoning Ordinance

[¶ 16] Artel and Smiling Hill (collectively Artel)[2] contend that the City was powerless to settle this litigation by a consent decree that exempts property from a land use ordinance. Artel asserts that the City's authority to engage in land use regulation is restricted to the express grants of authority found in Maine's land use statutes, 30–A M.R.S. §§ 4351–4361 (2011).

[¶ 17] Municipal governments are creatures of statute and have "only such powers as [are] conferred by statute expressly or by necessary implication." *City of South Portland v. State,* 476 A.2d 690, 693 (Me.1984) (alteration in original) (quotation marks omitted). In the zoning context, a municipality's "authority to make a zoning determination must be expressly granted by statute or ordinance." *Oeste v. Town of Camden,* 534 A.2d 683, 684 (Me.1987). Land use regulation is an area in which the Legislature has explicitly restricted the home rule authority of municipal governments. Title 30–A, chapter 187, subchapter 3 governs "Land Use Regulation" and states: "This subchapter provides express limitations on municipal home rule authority." 30–A M.R.S. § 4351. Thus, municipalities may not, under the guise of home rule authority, circumvent the zoning procedures of the land use regulation statute. *See Perkins v. Town of Ogunquit,* 1998 ME 42, ¶ 9, 709 A.2d 106 (concluding that a zoning ordinance that would permit a town to circumvent the express and implied requirements of the statute is impermissible).

[¶ 18] However, the regulation of land use by municipal governments does not occur in a vacuum, and municipalities necessarily exercise additional authority that may affect land use regulation. The City of Westbrook, like all municipalities, has been expressly granted the authority to sue and be sued. *See* 30–A M.R.S. § 2002 (2011). By necessary implication, this authority carries with it the authority to compromise disputed claims. *See City*

---

**2.** Smiling Hill joined Artel's brief on appeal.

*of South Portland,* 476 A.2d at 693 (stating that municipalities have powers that are necessarily implied from express statutory grants of power); 17 Eugene McQuillin, *The Law of Municipal Corporations* § 48:19 (3d ed. 2004). Our precedent has long recognized that municipal governments "clearly have the right to settle ... disputed claim[s] against them, thus saving the cost, vexation and uncertainty necessarily attendant upon litigation." *Vose v. Inhabitants of Frankfort,* 64 Me. 229, 234 (1875); *see also Lamb v. Town of Farmington,* 2004 ME 50, ¶¶ 2, 12, 846 A.2d 333 (deciding issues related to, but not questioning the propriety of, a settlement agreed to by the municipality). Although *Vose* was decided in the nineteenth century, its reasoning remains sound today. It would be a strange public policy that authorized municipalities to sue and be sued, but then compelled them to fully litigate every case to a final judgment with no possibility of resolving the dispute through good-faith settlement negotiations. Accordingly, a municipal government may settle litigation and compromise land use related claims through a consent decree because the authority for them falls naturally within the authority to sue and be sued.

[¶ 19] Here, the City is a party to a case involving a genuine controversy over land use, with no guarantee that it would prevail. If the case had proceeded to trial and Pike had prevailed on one or more of its equitable claims, the court could have determined that the City is equitably estopped or otherwise barred from enforcing its zoning ordinance so as to prevent Pike from operating a quarry on its property. A court exercising equity jurisdiction may, where the circumstances warrant, order that a municipality be equitably estopped from enforcing a valid zoning ordinance:

> [D]epending on the totality of the particular circumstances involved, which will include the nature of the particular governmental official or agency acting and of the particular governmental function being discharged as precipitating particular considerations of public policy, equitable estoppel may be applied to activities of a governmental official or agency in the discharge of governmental functions.

*City of Auburn v. Desgrosseilliers,* 578 A.2d 712, 714 (Me.1990) (quotation marks omitted). In *Desgrosseilliers,* we affirmed a judgment that equitably estopped the City of Auburn from enforcing its zoning ordinance, permitting the operation of a landscaping and nursery business in a zone where that use was otherwise forbidden. *Id.* at 713, 715–16.[3] The court therefore did not err in concluding that the City of Westbrook was authorized to enter into a consent decree that treats Pike's quarry-

---

**3.** We cautioned that such equitable relief must be circumscribed, however, explaining:

> Forceful policy reasons militate against restricting the enforcement of municipal zoning ordinances. Zoning ordinances are written to promote the public health, safety, welfare, convenience, morals, or prosperity of a community. Such ordinances should apply equally to all citizens; non-uniform enforcement of these ordinances tends to frustrate their purposes and to injure the public that these ordinances are designed to protect.

*City of Auburn v. Desgrosseilliers,* 578 A.2d 712, 715 (Me.1990) (citation omitted). The policy reasons cited in *Desgrosseilliers* apply equally whether a judgment is entered following a contested trial, as in *Desgrosseilliers,* or by consent of the parties, as is true here. *See Rogers v. City of Allen Park,* 186 Mich.App. 33, 463 N.W.2d 431, 435 (1990) (holding that a judgment may enjoin a municipality from interfering with a specified use of the property, but may not impose a substitute zoning classification for the property).

ing as a grandfathered use for purposes of the City's zoning ordinance.

## B. The Standard for Judicial Review of a Consent Decree

[¶ 20] Artel challenges the standard that the court applied in reviewing the decree, arguing that the court abused its discretion by failing to ascertain whether the consent decree was fair, reasonable, adequate, and lawful.

[¶ 21] The court, when explaining the standard it employed in conducting its review, noted that "[a]s a matter of policy, our system and rules encourage the settlement of disputes, particularly agreements that parties have arrived at without court intervention." The court further observed that consent decrees have attributes of both contracts and judicial decrees—contracts because they are reached through agreement of the parties, and judicial decrees because they are judicially enforceable as a judgment of the court. The court ultimately described the standard it would employ as one focused on "ensuring the parties' actual consent to the agreement and the agreement's lawfulness."

[¶ 22] The consent decree at issue in this case is distinguishable from a settlement agreement by which parties settle a purely private dispute that affects only the rights of the immediate parties to the litigation, as in a divorce settlement, for example, or a consent agreement with an agency of the State intended to redress a statutory or regulatory violation. Here, the consent decree results in an exercise of judicial authority that supersedes the otherwise applicable requirements of a validly enacted municipal zoning ordinance, thereby having an impact on the broader public within the municipality. We have not previously addressed the standard by which such consent decrees—those between municipalities and property owners that attempt to supplant a zoning ordinance—should be reviewed by the trial court, but we are mindful that "[j]udgmental decisions evaluating remedies in areas where the court has choices will be reviewed for sustainable exercise of the court's discretion." *Bates v. Dep't of Behavioral & Developmental Servs.*, 2004 ME 154, ¶ 38, 863 A.2d 890.

[¶ 23] We begin with a self-evident proposition: consent decrees that affect public rights should be subject to closer scrutiny than those that resolve purely private disputes, particularly where the consent decree is premised on an exercise of a court's equitable authority. Guidance in articulating the required level of scrutiny is provided in *Durrett v. Housing Authority of the City of Providence*, 896 F.2d 600 (1st Cir.1990). The standard Judge Coffin articulated in *Durrett* accounts for the "clear policy in favor of encouraging settlements," but also considers the broader policy considerations at play and the interests of third parties who will be affected by the decree. *Id.* at 604 (quotation marks omitted). As he explained:

> [A] court must assure itself that the parties have validly consented; that reasonable notice has been given possible objectors; that the settlement is fair, adequate, and reasonable; that the proposed decree will not violate the Constitution, a statute, or other authority; that it is consistent with the objectives of [the legislature]; and, if third parties will be affected, that it will not be unreasonable or legally impermissible as to them.

*Id.*

[¶ 24] We thus clarify that when a court is asked to approve a consent decree arising under the court's equitable jurisdiction that will affect the enforcement of a land use ordinance, it should ensure that the following five elements are

met and that entering the decree is fair, adequate, and reasonable, and an appropriate exercise of the court's equitable authority: (1) the parties have validly consented; (2) reasonable notice has been given to possible objectors and they have been afforded a reasonable opportunity to present their objections; (3) the consent decree will not violate the United States or Maine Constitutions, a statute, or other authority; (4) the consent decree is consistent with express legislative objectives and other zoning-related public policy considerations; and (5) the consent decree is reasonable and is not legally impermissible in its effects on third parties.[4]

[¶ 25] When considering these elements, courts should uphold the public policy favoring the settlement of disputed claims by deferring to the reasonable judgments and compromises made by the settling parties. However, the court's deference should be tempered by the separate public policy favoring the uniform applicability and enforcement of zoning ordinances. These considerations are encompassed by the fifth factor, which calls upon the court to consider, among other things, whether the extent to which a consent decree will interfere with a municipality's land use regulatory scheme is no greater than that reasonably needed to achieve the consent decree's objectives.

[¶ 26] In this case, the court could not have anticipated our adoption of the preceding factors and, therefore, it did not err by failing to address them. Further, we are satisfied that the court implicitly considered the factors in conducting its review. Contrary to Artel's argument, the

court did not abuse its discretion by failing to explicitly determine that the consent decree is fair, reasonable, and adequate, in addition to determining its lawfulness.

C. Process for the Approval of the Consent Decree

[¶ 27] Artel also contends that it was unlawfully excluded from the process by which the consent decree was negotiated and that the court wrongly denied it an opportunity to present evidence in opposition to the decree before it was approved.

[¶ 28] It is well established that a court may enter a consent decree over the objection of intervenors as long as the decree does not "dispose of an intervenor's valid claims." *Butler v. D/Wave Seafood,* 2002 ME 41, ¶ 13, 791 A.2d 928. Thus, if an intervenor has brought no independent claims against the other parties to the action, its opposition alone is insufficient to prevent those parties from settling and thereby ending the litigation. *See id.* Whether a consent decree will dispose of an intervenor's independent claims is part of the overall inquiry into the lawfulness of the decree. Notwithstanding the objection of intervenors, if the court finds that each of the five elements identified above is met, it may approve the decree.

[¶ 29] In its order granting Pike's motion for a nonevidentiary hearing regarding the entry of the consent decree, the court stated: "[B]ecause the objections of Artel and Smiling Hill are sufficiently informed by the existing record evidence and the well-made arguments of the par-

---

4. Although intervention in an action is not always possible or authorized, *see* M.R. Civ. P. 24, a court has at its disposal alternative means of assessing the impact of a judgment on third parties, and we have previously acknowledged that such consideration of third-party concerns is appropriate in cases involv-

ing the public interest. *See State v. Maine-Health,* 2011 ME 115, ¶¶ 5–6, 15–16, 31 A.3d 911 (affirming the denial of a motion to intervene in an antitrust case in which the court had permitted third-party participation through oral and written comment).

ties and the intervenors, . . . an evidentiary hearing is not warranted." We discern no error in this conclusion.

[¶ 30] The intervenors primarily wanted to introduce evidence regarding the manner in which the City negotiated and entered into the consent decree. As a party to litigation with the authority to compromise claims, the City had the discretion to determine its litigation strategy and engage in negotiations with Pike and IDEXX. It was not required to engage in settlement negotiations or share its litigation strategy with Artel. "[T]he ability [of a municipality] to secure a settlement [in land use litigation] will often require that the groundwork be laid in private conversations between the initial decision and final settlement." R. Lisle Baker, *Exploring How Municipal Boards Can Settle Appeals of Their Land Use Decisions Within the Framework of the Massachusetts Open Meeting Law*, 44 Suffolk U.L.Rev. 455, 468 (2011); *see also* 1 M.R.S. § 405(6)(E) (2011) (permitting a government body to hold an executive session for consultation with its attorney regarding pending litigation and settlements).

[¶ 31] The record demonstrates that Artel had ample opportunity to be heard in opposition to the proposed consent decree, both at meetings before the City Council prior to its approval of the consent decree and at the hearing conducted by the court. *See Crispin v. Town of Scarborough*, 1999 ME 112, ¶ 20, 736 A.2d 241 (noting that the public's right to be heard in zoning matters pursuant to 30–A M.R.S. § 4352(1) is "not unlimited"). Because Artel had an adequate opportunity to be heard and the relevance of the primary

issue about which it wished to introduce additional evidence was marginal, the court acted within the bounds of its discretion in concluding that the additional presentation of evidence was unnecessary. *See Randall v. Conley*, 2010 ME 68, ¶¶ 18–19, 2 A.3d 328.

### D. The Enforceability of the Consent Decree's Performance Standards

[¶ 32] For the reasons we have stated, the City has general authority to resolve land use litigation by consent decree that includes a judicial declaration that a particular land use—here, quarrying—is grandfathered for purposes of the City's land use ordinance. We turn now to consider Artel's additional challenge to the detailed performance and use standards adopted by the consent decree that will supersede otherwise applicable provisions of the City's zoning ordinance.

[¶ 33] As described by the court, "[t]he Consent Order contains numerous and detailed performance standards, prescribing the areas where and the method by which Pike will be able to continue its mining operation." The consent decree addresses the enforcement of those standards in paragraph 57, entitled "Violations of Performance or Use Standards." The provision states: "The City may enforce any violations of this Consent Order pursuant to the provisions of 30–A M.R.S.A. § 4452."

[¶ 34] Title 30–A M.R.S. § 4452 provides for the enforcement of local laws and ordinances by the municipal officials who are "designated by ordinance or law with the responsibility to enforce" them. 30–A M.R.S. § 4452(1).[5] The judicial pro-

---

5. Title 30–A M.R.S. § 4452(1) (2011) provides as follows:

    **1. Enforcement.** A municipal official, such as a municipal code enforcement offi-

cer, local plumbing inspector or building official, who is designated by ordinance or law with the responsibility to enforce a par-

cess that governs land use violation proceedings in the District Court is laid out in M.R. Civ. P. 80K, but section 4452 actions may also be heard in the Superior Court pursuant to that court's general jurisdiction. *See* M.R. Civ. P. 80K(a); *City of Biddeford v. Holland,* 2005 ME 121, ¶¶ 7–9, 886 A.2d 1281. Section 4452(5) states that it "applies to the enforcement of land use laws and ordinances or rules that are administered and enforced primarily at the local level" and includes a list of twenty such laws, ordinances, and rules. 30-A M.R.S. § 4452(5).[6] Absent from the list are consent decrees and other court judgments, and none of the laws, ordinances, and rules identified in section 4452(5) are so closely analogous to consent decrees that we could infer that the Legislature intended consent decrees to be within the ambit of the statute.

[¶ 35] The consent decree's adoption of 30-A M.R.S. § 4452 in paragraph 57 as a mechanism for the enforcement of its provisions is, therefore, not authorized by law. Nor does the City otherwise have the authority, outside the ambit of the land use statutes, to adopt land use regulations like the performance standards here.[7] *See* 30-A M.R.S. §§ 4351–4361; 30-A M.R.S. § 4452; *Local No. 93,* 478 U.S. at 526, 106 S.Ct. 3063 (noting that parties may not bind themselves in ways that are contrary to law); *Oeste,* 534 A.2d at 684.

[¶ 36] In addition, and contrary to the assertion of Pike and the City, the distinc-

---

ticular law or ordinance set forth in subsection 5, 6 or 7, may:

    **A.** Enter any property at reasonable hours or enter any building with the consent of the owner, occupant or agent to inspect the property or building for compliance with the laws or ordinances set forth in subsection 5. A municipal official's entry onto property under this paragraph is not a trespass;

    **B.** Issue a summons to any person who violates a law or ordinance, which the official is authorized to enforce; and

    **C.** When specifically authorized by the municipal officers, represent the municipality in District Court in the prosecution of alleged violations of ordinances or laws, which the official is authorized to enforce.

6. Title 30-A M.R.S. § 4452(5) (2011) provides in part as follows:

    **5. Application.** This section applies to the enforcement of land use laws and ordinances or rules that are administered and enforced primarily at the local level, including:

    **A.** The plumbing and subsurface waste water disposal rules adopted by the Department of Health and Human Services under Title 22, section 42, including the land area of the State that is subject to the jurisdiction of the Maine Land Use Regulation Commission;

    **B.** Laws pertaining to public water supplies, Title 22, sections 2642, 2647 and 2648;

    **C.** Local ordinances adopted pursuant to Title 22, section 2642;

    **D.** Laws administered by local health officers pursuant to Title 22, chapters 153 and 263;

    . . . .

    **G.** Local land use ordinances adopted pursuant to section 3001;

    . . . .

    **O.** Local zoning ordinances adopted pursuant to section 3001 and in accordance with section 4352.

7. There is no question that the performance standards constitute land use regulations that are subject to the statutory zoning requirements of 30-A M.R.S. §§ 4351–53 (2011). As the City itself has described, the consent decree "contains a detailed list of operational requirements for the [p]roperty," including requirements for buffers and limitations on various activities such as blasting, truck trips, and asphalt and concrete manufacturing. This type of regulation is expressly contemplated by the Legislature's definitions of land use and zoning ordinances, which are those regulations and ordinances that "control[ ], direct[ ] or delineate[ ] allowable uses of land and the standards for those uses." *See* 30-A M.R.S. § 4301(8), (15–A) (2011).

tion between executive and legislative acts does not change the analysis. The executive authority of a municipality is no more or less subject to the "express limitations on municipal home rule authority" established by the land use regulation statute, 30–A M.R.S. §§ 4351–4361, than is its legislative authority. *See* 30–A M.R.S. § 4351. In restricting municipal home rule authority to regulate land use, the Legislature did not distinguish between executive and legislative acts. Further, it is not implicit in section 4351 that such a distinction should be drawn. If the restrictions apply only to municipal acts deemed legislative but not those deemed executive, municipalities would be free to regulate land use through contracts, executive orders, or, as in this case, consent decrees, free from the Legislature's stated intention of imposing limitations on home rule authority. *See League of Residential Neighborhood Advocates v. City of Los Angeles*, 498 F.3d 1052, 1057 (9th Cir.2007) (rejecting "any argument that the City may circumvent its zoning procedures by referencing its general authority to settle litigation"). There is no basis in the land use regulation statute's language or purpose to infer such an exception.[8] *See Peters v. O'Leary*, 2011 ME 106, ¶ 13, 30 A.3d 825 ("A statute will be interpreted according to its plain meaning to discern the intent of the Legislature.").

[¶ 37] Although the City, Pike, and IDEXX may have intended to treat the decree's performance standards as the legal equivalents of ordinances subject to enforcement under section 4452,[9] unless and until they are adopted as such through a contract zoning agreement or the amendment of the City's land use ordinance, they are not ordinances subject to section 4452. This gap in enforceability is highlighted by the effect it has on the public's rights under the City's zoning ordinance. Because the decree's performance standards are not embodied in a contract zoning agreement or, more generally, in the City's zoning ordinance, the right otherwise afforded to "any person" by the zoning ordinance to "file[ ] a complaint with the Code Enforcement Officer that [the] Ordinance is being violated," thus requiring the CEO

8. For this reason, we also reject Pike's and the City's arguments that the City's prosecutorial discretion whether to enforce zoning violations lends legal support for the entry of the consent decree. The enforcement discretion envisioned by 30–A M.R.S. § 4452 (2011) entails the discretion to prosecute a possible violation of existing land use law, and it permits municipalities to settle enforcement actions by, for example, agreeing to waive or reduce the penalties that may be ordered, including fines and correction of the violation, in exchange for some action on the part of the violator. *See* 30–A M.R.S. §§ 4452(1), (3); *see also, e.g., Cayer v. Town of Madawaska*, 2009 ME 122, ¶ 6 n. 2, 984 A.2d 207 (noting the entry of a consent judgment requiring violators to pay a fine and suspending an additional fine unless and until a new violation arose); *Sproul v. Town of Boothbay Harbor*, 2000 ME 30, ¶ 5 n. 3, 746 A.2d 368 (mentioning a consent agreement where the town agreed to refrain from further legal ac-

tion in exchange for the payment of costs and the removal of part of a violating structure); *Inhabitants of the Town of Gorham v. Jones*, 1986 Me.Super. LEXIS 316, at *2–3 (Oct. 24, 1986) (discussing a consent judgment suspending the fine for a violation in exchange for the immediate cessation of the violation).

9. This view is reflected in the parties' arguments to the court at the hearing on the approval of the consent decree. Pike asserted that it would be "pointless" to require Westbrook's City Council to adopt the terms of the consent decree through its zoning authority because "the ultimate body in the City responsible for zoning is the City Council and the City Council is the same body that approved this consent order.... So, for practical purposes, it doesn't really make any sense to do that because the City Council is responsible ultimately for zoning and for settlement of litigation."

to "immediately examine the subject of the complaint and take appropriate action," will not apply to Pike's property. *See* Westbrook, Me., Zoning Ordinance § 604.4 (July 11, 2011);[10] *see also Indus. Commc'ns & Elecs., Inc. v. Town of Alton,* 646 F.3d 76, 80 (1st Cir.2011) (noting citizens' "legal interest under state law in the protection that the zoning laws afford to their property"); Stewart E. Sterk, *Structural Obstacles to Settlement of Land Use Disputes,* 91 B.U. L.Rev. 227, 266–67 (2011) (discussing the impact that land use consent decrees may have in "preclud[ing] neighbors from raising legal issues that they previously had standing to raise, even though they were not parties to the proceeding that cut off their rights").

[¶ 38]  This does not mean that the performance and use standards agreed to by the City, Pike, and IDEXX cannot be achieved through a consent decree absent the Legislature's amendment of section 4452.  Here, the court may preliminarily approve the consent decree, with its final approval conditioned on the City Council's adoption of the consent decree's performance and use standards in a contract zoning agreement or as amendments to the zoning ordinance, following the completion of the applicable procedures.[11] *See* 30–A M.R.S. § 4352(8) (2011) (authorizing contract zoning); Westbrook, Me., Zoning Ordinance §§ 106.2 (discussing process for amendments), 107 (discussing process for contract zoning).  This approach would keep Pike's property within the framework of the City's zoning ordinance, thus subjecting Pike's property to land use enforcement pursuant to section 4452.

[¶ 39]  Accordingly, although we affirm the court's determination that the City had the authority to settle this land use litigation through a consent decree that declares Pike's operation of a quarry on its property to be a grandfathered use under the City's zoning ordinance, we vacate the judgment for the reasons we have stated and remand for further proceedings.  We have considered and are not persuaded by the remaining arguments presented by the parties and conclude that we need not address them further.

The entry is:

Judgment affirmed as to the court's denial of an evidentiary hearing and its determination that the City has the authority to settle this litigation through a consent decree declaring Pike's operation of a

---

10. Specifically, section 604.1 of the City's zoning ordinance provides that the "Code Enforcement Officer (CEO) shall enforce [the] Ordinance," and section 604.4 authorizes a person to file a complaint with the CEO that the ordinance is being violated, after which the CEO "shall immediately examine the subject of the complaint and take appropriate action." Westbrook, Me., Zoning Ordinance §§ 604.1, 604.4 (July 11, 2011).  Once an ordinance violation "comes to the attention of the [CEO]," the CEO must order the property owner to cease the unauthorized activity, and if the owner does not comply, the CEO "shall take appropriate legal action." *Id.* § 604.5. The ordinance states that such legal enforcement "shall" be conducted by the CEO in accordance with section 4452. *Id.* § 801.

11. The Westbrook Zoning Ordinance describes the process of contract zoning:

[C]ontract zoning is authorized where, for such reasons as the unusual nature or unique location of the development proposed, the City Council finds it necessary or appropriate to impose, by agreement with the property owner or otherwise, certain conditions or restrictions relating to the physical development or operation of the property, which are not generally applicable to other properties similarly zoned.  All rezoning under this section shall establish rezoned areas, which are consistent with the existing and permitted uses within the original zones.  All such rezoning shall be consistent with the City's Comprehensive Plan.

Westbrook, Me., Zoning Ordinance § 107(B).

quarry on its property to be a grandfathered use under the City's zoning ordinance; judgment otherwise vacated and remanded to the Business and Consumer Docket for proceedings consistent with this opinion.