MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:     2013 ME 11
Docket:       PUC-12-91
Argued:       November 7, 2012
Decided:      January 24, 2013

Panel:        SAUFLEY, C.J., and LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

## NORTHERN NEW ENGLAND TELEPHONE OPERATIONS LLC

v.

## PUBLIC UTILITIES COMMISSION

GORMAN, J.

[¶1]  Northern New England Telephone Operations LLC, d/b/a FairPoint Communications-NNE (FairPoint), appeals from an order of the Public Utilities Commission (the 2012 order) determining how "addressability" will be measured when calculating FairPoint's broadband buildout commitments in Maine.  Those commitments originated in a 2008 Commission order (the merger order) that incorporated an amended stipulation presented by FairPoint and other parties. FairPoint primarily contends that the merger order constitutes a consent decree and that the Commission erred by failing to interpret the merger order in a manner consistent with the intent and understanding of the parties to the stipulation.[1]  We affirm the Commission's order.

---

[1]  FairPoint also argues that the 2012 order violates its due process rights and the takings clauses of the U.S. and Maine Constitutions.  *See* U.S. Const. amend. V; U.S. Const. amend. XIV, § 1; Me. Const. art. I, §§ 6-A, 21.  Because the 2012 order is not arbitrary and does not exceed the scope of the

## I. BACKGROUND

[¶2]   FairPoint's broadband obligations in Maine arose from a utility reorganization effected by a merger between Verizon New England Inc., d/b/a Verizon Maine (Verizon), and FairPoint.[2]   Pursuant to the merger, Verizon was to transfer its local exchange and long distance telephone businesses to FairPoint, and FairPoint would start providing regulated telephone utility service to Maine citizens and businesses.   On or about February 1, 2007, as required by 35-A M.R.S. § 708 (2007),[3]   Verizon and FairPoint filed a request with the Commission seeking the approvals and authorizations needed for the utility reorganization to proceed.   In considering the request, the Commission began an adjudicatory proceeding in which numerous parties intervened, including the Office of the Public Advocate.

---

Commission's authority or the merger order, it does not violate FairPoint's due process rights. *See Pine Tree Tel. & Tel. Co. v. Pub. Utils. Comm'n*, 634 A.2d 1302, 1305 (Me. 1993).  The merger order also does not constitute a confiscatory taking that requires compensation pursuant to the takings clause of the U.S. and Maine Constitutions. *See Nat'l Council on Comp. Ins. v. Superintendent of Ins.*, 481 A.2d 775, 781 (Me. 1984).

[2]   "FairPoint," as used here with respect to the merger proceeding, includes Northern New England Telephone Operations, Inc.; Enhanced Communications of New England, Inc.; Northland Telephone Company of Maine, Inc.; Sidney Telephone Company; Standish Telephone Company; China Telephone Company; Maine Telephone Company; and Community Service Telephone Company.

[3]   Title 35-A M.R.S. § 708 has since been amended; it is no longer applicable to telephone utilities other than providers of last resort. P.L. 2011, ch. 623, §§ A-13, A-14 (effective Aug. 30, 2012) (codified at 35-A M.R.S. §§ 708(1)(C), (5) (2012)).

[¶3]   During the merger proceedings, the Commission's hearing examiner and advisory staff (examiners) issued a report reviewing the merger proposal.  The examiners recommended that the merger not be approved because the debt FairPoint would acquire presented too great a risk of causing FairPoint to experience financial failure.  In their report, the examiners stated that "FairPoint's commitment to increase investment in facilities that [would] deliver broadband services" to more Maine consumers than Verizon had was "the most obvious of [the] potential advantages offered by the proposed merger."

[¶4]   In explaining FairPoint's proposal, the examiners noted that FairPoint used the term "addressability" when referring to its proposed expansion of broadband service.  As the term was used by FairPoint, addressable lines included some lines that were not actually capable of providing broadband service because of line characteristics such as length or the presence of "disrupters."  Verizon did not count those lines in its broadband buildout estimates.  Thus, to facilitate a comparison of FairPoint's proposal with Verizon's broadband buildout estimates, the examiners, in their report, referred to addressable lines in the same way FairPoint did.

[¶5]   After receiving the examiners' report, FairPoint, Verizon, the Commission's advocacy staff, the Public Advocate, and some of the other interveners filed a stipulation with the Commission on or about December 21,

4

2007. This stipulation, as later amended on January 3, 2008, committed FairPoint to expanding "DSL [a]vailability in Maine to reach . . . 83% addressability of Maine access lines within two years of the closing of the Merger" and "attaining 90% DSL addressability by the end of the five year period" beginning when the merger closes. "Addressability" was not defined in the stipulation.

[¶6] Upon its review, the Commission found that the proposed merger was "consistent with the interests of ratepayers and investors" and that its potential benefits outweighed its risks. Thereafter, the Commission added conditions to those contained in the amended stipulation, approved the merger with the new conditions, and "explicitly integrated [the amended stipulation] into, and made [it] a part of" its merger order. Although the merger order, like the amended stipulation, discusses FairPoint's broadband buildout obligations in terms of addressability, it contains no definition of the term.

[¶7] Approximately twenty months after the Commission's approval of the merger, FairPoint filed a voluntary petition for relief pursuant to Chapter 11 of the U.S. Bankruptcy Code. *See* 11 U.S.C.S. §§ 1101-1146 (LexisNexis 2012). In connection with those bankruptcy proceedings, FairPoint, the Public Advocate, and a Commission representative reached a regulatory settlement agreement that, among other things, reduced FairPoint's ultimate broadband buildout obligations from 90% addressability to 87%. The Commission agreed to that reduction in a

July 6, 2010, order (the 2010 order), finding that "the benefit to be gained from a financially sound FairPoint, and the risks inherent in making substantive changes to the Regulatory Settlement, outweigh the potential hardship to be faced by the 3% of customers that may not receive broadband service." In the 2010 order, the Commission also amended the merger order by approving and incorporating other provisions that extended deadlines for FairPoint's broadband buildout[4] and committed FairPoint to providing broadband technology with "a minimum upload speed of 512 kilobits and a download speed of 1.5 megabits per second."

[¶8] After the first milestone date, FairPoint notified the Commission that it had expanded broadband buildout to the level of 83%. The Public Advocate disagreed, contending that FairPoint had used the wrong measure of addressability and therefore overstated its results. In calculating its addressability ratio, FairPoint used as its numerator the number of lines that terminated at a DSL-equipped facility, regardless of whether a line's characteristics prevented it from being capable of providing DSL service. It used as its denominator the number of residential and business switched-access lines existing as of the summer of 2007.[5]

---

[4] The 2010 order created broadband buildout milestones of 83% addressability by December 31, 2010, 85% by July 31, 2012, and 87% by March 31, 2013.

[5] The dispute in this case involves the numerator. In proceedings before the Commission, however, the Public Advocate also disputed FairPoint's calculation of the denominator. The Commission ultimately determined that the denominator would include all current access lines, i.e., all lines FairPoint can provide telephone service to as of each milestone date, rather than using the line count from 2007. FairPoint did not appeal the determination of the denominator.

6

The Public Advocate argued that lines that cannot be made to actually provide DSL service in a short period of time should not be included in the numerator. Following a hearing, the Commission determined that when calculating addressability, FairPoint could include in the numerator only "those lines that are actually capable of receiving broadband service plus those lines that can be made ready to receive it within 15 days following a request for service by a customer." The Commission further held that only those lines that meet the requirements of the 2010 order, including the speed requirements, may be included in the numerator.  FairPoint appeals pursuant to 35-A M.R.S. § 1320 (2012).

## II.  DISCUSSION

A.    The Merger Order

[¶9]  The outcome of this appeal turns on the nature of the merger order. FairPoint argues that, because the merger order approved the amended stipulation among some of the parties to the merger proceeding, the merger order should be treated as a consent decree and the Commission's interpretation of it is therefore subject to de novo review, rather than the deferential review we typically afford the Commission's interpretations of its own decisions.

[¶10]  "[A] consent decree is the product of negotiations by parties who elect to waive their rights to litigate and, instead, reach a compromise in which the parties each give up something they might have won through litigation." *State*

*v. Shattuck*, 2000 ME 38, ¶ 18, 747 A.2d 174. It contains aspects of both a private contractual agreement and a court judgment or agency order; the parties essentially agree to a set of facts and a remedy and request court or agency approval of it so that it has the weight of a judicial decree or agency order. *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 236 n.10 (1975); *Shattuck*, 2000 ME 38, ¶ 18, 747 A.2d 174.

[¶11] Due to the unique hybrid nature of consent decrees, a court's role in determining whether to approve or deny a proposed consent decree is somewhat limited. *Long v. State*, 807 A.2d 1, 7, 9-10 (Md. 2002). Typically, a court reviews a proposed consent decree to determine whether it is "fair, adequate, and reasonable" and to ensure that it does not violate any existing law. *Id.* at 9 (quotation marks omitted); *Bragg v. Robertson*, 83 F. Supp. 2d 713, 717-18 (D. W. Va. 2000) (quotation marks omitted). Closer scrutiny is required, however, if the proposed consent decree affects public rights. *Pike Indus., Inc. v. City of Westbrook*, 2012 ME 78, ¶ 23, 45 A.3d 707.

[¶12] Like a consent decree, the Commission's order is based, at least in part, on a stipulated record of facts. That is where the similarity ends, however. The "merger" between FairPoint and Verizon was not a private, corporate event or a litigated dispute. Rather, the merger represented FairPoint's attempt to become the "utility" that would provide telephone service to Maine consumers. Because

8

telephone utilities are regulated by the Commission, the merger could not have occurred without the Commission's approval. *See* 35-A M.R.S. § 708(2)(A) (prohibiting a reorganization from taking place without Commission approval).[6]

[¶13]  In its role as the regulatory body tasked with overseeing the activities of competitive service providers, the Commission could only grant its approval if the transaction was consistent with ratepayers' and investors' interests. *Id*.; *see also* P.L. 1987, ch. 141, emergency pmbl. (effective July 1, 1987) (recognizing the "vital interests" of the public in the regulation of public utilities). This requirement for regulatory approval, focused on the public interest, changed the nature of the amended stipulation that became the merger order:

> Any agreement that must be filed and approved by an agency loses its status as a strictly private contract and takes on a public interest gloss. That means that when the agency reconciles ambiguity in such a contract it is expected to do so by drawing upon its view of the public interest. And, therefore, the agency to which Congress entrusted the protection and discharge of the public interest is entitled to just as much benefit of the doubt in interpreting such an agreement as it would in interpreting its own orders, its regulations, or its authorizing statute.

---

[6]  The merger transaction between Verizon and FairPoint also required Commission approval pursuant to 35-A M.R.S. §§ 304, 1101, 1104 (2012), 35-A M.R.S. §§ 707, 2102, 2105 (2007), and 47 U.S.C.S. §§ 214(e), 254(e) (LexisNexis 2012). Title 35-A M.R.S. §§ 707, 2102, and 2105 (2007) have since been amended such that they are no longer applicable to telephone utilities other than providers of last resort. P.L. 2011, ch. 623, §§ A-12, A-17 (effective Aug. 30, 2012) (codified at 35-A M.R.S. §§ 707(6), 2102(3) (2012)).

*Cajun Electric Power Coop., Inc., v. FERC*, 924 F.2d 1132, 1135 (D.C. Cir. 1991) (citations omitted); *see also In re Entergy Corp.*, 142 S.W.3d 316, 323-24 (Tex. 2004) (observing that, in regulatory merger proceedings, what begins as a private contract may take on an administrative character when there is a public interest involved and regulatory approval is required).

[¶14]  Here, after engaging in a risk-benefit analysis to determine whether the transaction was, on the whole, consistent with ratepayers' and investors' interests, the Commission accepted and approved the parties' amended stipulation, added some conditions without the prior approval of the parties who presented the stipulation, and approved the merger.  *See* 35-A M.R.S. § 708(2)(A) (requiring the Commission to impose conditions necessary to protect ratepayers).  In determining whether to incorporate the parties' amended stipulation into its order, the Commission exercised its expertise in this area and effectively took ownership of the amended stipulation.  *See N. Ind. Pub. Serv. Co. v. U.S. Steel Corp.*, 907 N.E.2d 1012, 1017-18 (Ind. 2009).  As the statutory provisions governing the Commission's approval of the transaction make clear, the Commission's role in approving the amended stipulation for the merger proceeding is not equivalent to the role a court or agency plays in approving a consent decree.  We conclude that the merger order is an order of the Commission, and not a consent decree.

10

B.    The 2012 Order

[¶15]  Because the merger order is an order of the Commission, we review the Commission's 2012 order interpreting the merger order "for errors of law, abuse of discretion, or findings of fact not supported by the record." *Covanta Me., LLC v. Pub. Utils. Comm'n*, 2012 ME 74, ¶ 10, 44 A.3d 960 (quotation marks omitted).  FairPoint contests two aspects of the 2012 order: (1) the numerator that FairPoint must use when calculating addressability, and (2) the minimum upload and download speed requirements.

[¶16]  Before defining "addressability," the Commission found that the term had not been defined in its previous orders and that the examiners' report, which discussed how FairPoint had used the term, was not controlling on the matter. Because the record supports those findings, we do not discuss them further. *See id.* The Commission, as the issuing agency of the order in which the term was used, was required to determine, within its area of expertise, what "addressability" means. *See N. Ind. Pub. Serv. Co.*, 907 N.E.2d at 1018.

[¶17]  The definition of "addressability" that FairPoint advocates would allow FairPoint to satisfy its broadband buildout obligations in Maine by counting lines that are not capable of providing DSL service to customers.  The Commission concluded that such a definition was illogical and antithetical to the goal of expanding broadband buildout in Maine.  It determined that "addressable" lines,

i.e., those that FairPoint could include in the numerator when reporting the extent of its broadband buildout, would only comprise "those lines that are actually capable of receiving broadband service plus those lines that can be made ready to receive it within 15 days following a request for service by a customer." We do not find anything "unreasonable, unjust or unlawful" about defining addressability in that way. *Quiland, Inc. v. Pub. Utils. Comm'n*, 2008 ME 135, ¶ 9, 956 A.2d 127 (quotation marks omitted).

[¶18] We also discern no error in the imposition of the minimum upload and download speed requirements referenced in the 2012 order. FairPoint contends that nothing in the amended stipulation or merger order imposes speed requirements. Although it is true that the original merger order did not include speed requirements, the Commission exercised its statutory authority to amend the merger order after FairPoint sought relief through a bankruptcy proceeding. *See* 35-A M.R.S. § 1321 (2012) (granting the Commission the authority to "rescind, alter or amend any order it has made" at any time so long as it gives notice to the utility and the parties to the original proceeding). The Commission's 2010 order amended the merger order by, among other things, approving section 2.2 of the regulatory settlement, to which FairPoint was a party. Section 2.2 of the regulatory settlement states that FairPoint's broadband buildout commitments "may be met by installation of DSL or any other broadband technology which provides a minimum

upload speed of 512 kilobits and download speed of 1.5 megabits per second."
This language clearly and unambiguously amends the merger order to impose
minimum speed requirements on any technology FairPoint wants to use to meet its
broadband buildout obligations, including DSL. Accordingly, the Commission did
not err by including minimum speed requirements in its 2012 order.

The entry is:

Order of the Commission affirmed.

**On the briefs:**

Joseph G. Donahue, Esq., Neal F. Pratt, Esq., and Jonathan G. Mermin, Esq., Preti Flaherty, LLP, Augusta, for appellant Northern New England Telephone Operations LLC

Andrew S. Hagler, Esq., Jordan D. McColman, Esq., and Joanne B. Steneck, Esq., Maine Public Uitilities Commission, for appellee Maine Public Utilities Commission

Wayne R. Jortner, Esq., and William C. Black, Esq., Public Advocate Office, Augusta, for appellee Office of the Public Advocate

**At oral argument:**

Joseph G. Donahue, Esq., for appellant Northern New England Telephone Operations LLC

Andrew S. Hagler, Esq., for appellee Maine Public Utilities Commission

Wayne R. Jortner, Esq., for appellee Office of the Public Advocate